FILED
Clerk's Office
USDC, Mass.
Date 6/1/04
By_____
Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.  ) | Criminal No. 04-10048-NG |
| ) | |
| CARMELO RODRIGUEZ ) | |

## GOVERNMENT'S RESPONSE TO EMERGENCY MOTION

This is a drug case brought against four members of the leadership of the Lowell Chapter of the Almighty Latin' Kings Nation Street Gang. The indictment is based on 15 hand-to-hand purchases of cocaine made from Carmelo Rodriguez, a/k/a "King Carmelo" and his co-defendants. All of the cocaine purchases made from King Carmelo were to a cooperating witness who was driving an undercover car equipped with a video camera. That camera captured both the sales and what Mr. Rodriguez had to say about them in exquisite detail and prompted him to plead guilty to many--but not all--of the charges against him.

Carmelo Rodriguez made nine of the 15 sales of cocaine included in this case (either alone or with other defendants). By themselves, King Carmelo's sales (made over a four-month period) exceed 150 grams. Rodriguez also told the CW on tape that he flushed $6,000 worth of additional cocaine when the Lowell police came to his house on January 1, 2004 looking for co-defendant Jonathan Deleon (who was wanted for a New Year's eve shooting). Rodriguez further said (also on tape) on two other occasions that he was selling cocaine regularly and had other

amounts of cocaine on his person. King Carmelo acknowledged that he was selling up to eight ounces of cocaine a week and supplied cocaine on each and every occasion he was asked other than during a trip he took to Florida.

As important as this evidence is, the record also establishes that Carmelo Rodriguez is a leader of a violent street gang with statewide (and indeed national) connections. The Massachusetts Chapter of the Latin Kings is a street gang with hundreds of members in Lawrence, Lowell and other cities. The Latin Kings operate local chapters throughout the state including chapters inside many correctional facilities. Many members of the gang are involved in a broad range of illegal activities including gun and drug trafficking and crimes of violence. Information regarding the gang and its well deserved reputation for violence are described in more detail in the Affidavit of S/A Mark Karangekis attached as Exhibit 1. See Affidavit at ¶¶3-5 (background of the investigation); ¶¶6-29 (general information regarding the Latin Kings and their operations); ¶¶34-35 (identifying Carmelo Rodriguez as the Supreme Inca of the Lowell Chapter of the Latin Kings and describing two instances in which he was associated with firearms).

The general information about violence undertaken by the Latin Kings contained in the Karangekis Affidavit was fully

2

corroborated by the investigation in this and other related cases involving other Latin Kings also involved in drug trafficking. For example, when Carmelo Rodriguez was arrested on February 24, 2004, he stated that he would have "merc'd up" (i.e., used violence against) the police who came to arrest him. See Exhibit 2. On the same day, co-defendant Geicliff Rodriguez, a/k/a "King Bear" (another Latin King leader who the record showed was the third ranking leader for the Latin Kings in the state and dealt cocaine *for* King Carmelo) told the police that he knew who had ratted him out and that "they better move her to Egypt cause I'm gonna' get her." See Exhibit 3. Other members of the Latin Kings targeted in this investigation also openly discussed incidents in which other members of the gang who had cooperated with law enforcement had been terminated from the gang and severely beaten. See Exhibit 4 (FBI-302 dated 11/9/03 in which Latin King leader Angel Rivera, a/k/a "King Venom" discussed incidents in which members who "snitched" were terminated from the gang by beating). The danger posed by members of this gang to cooperators is even greater given what the investigation showed about the proclivity of the defendants here to carry firearms and by their leadership positions. See Exhibit 5 (various reports regarding use or marketing of firearms by Carmelo Rodriguez and the other defendants in this investigation including) at page 1 (Lowell Police Department Report describing prior firearms

arrest); page 2 (Carmelo is the leader of the Lowell chapter of the Latin Kings); page 4 (Rosario indicates that Carmelo has guns and crack cocaine for sale); page 7 (Carmelo says on tape that he will notify CW as soon as he has "strizzles" or guns for sale) page 11 (Carmelo says he will have strizzles soon); 16 (Giecliff describes gang shooting with Carmelo); page 18 (Carmelo has 9mm handgun); page 20 (guns recently seized by Lowell PD belonged to Carmelo) page 22 (same).

Since the beginning of this case, the defendant has been aware that the government would not agree to release of early information about its cooperating witnesses because of the very real threat of violence and retaliation posed by the defendants and their Latin King confederates who remain on the street. See March 15, 2004 Automatic Disclosure letter attached as Exhibit 6. The defendant has nevertheless now filed an "emergency" motion seeking such information. His motion does not even acknowledge, (much less address) the very real threat of violence in this case posed by the Latin Kings or how the cooperating witnesses can be protected. Instead, the defendant purposefully obfuscates the difference between Brady and Giglio information and focuses on a variety of claims suggesting that the government has provided an "incomplete or distorted" picture of the case to U.S. Probation.[1]

---

[1] The defendant has repeatedly been advised that there is no Brady information at issue.

4

Rather than address these claims (which of course are for US Probation to examine in the first instance and for this Court to decide at sentencing), the government will address what is really at issue--the defendant's request for immediate disclosure of information regarding its cooperating witnesses, one or more of whom the government may seek to use at the sentencing hearing.

### 1. The Government Has No General Obligation to Disclose the Identity of Trial Witnesses in Advance

There is no constitutional or statutory requirement that the identities of prosecution witnesses be disclosed before trial or a sentencing hearing. United States v. Bello-Perez, 977 F.2d 664, 670 (1st Cir. 1992); United States v. Reis, 788 F.2d 54, 58 (1st Cir. 1986); United States v. Barrett, 766 F.2d 609, 617 (1st Cir.1985). See also United States v. Hamilton, 452 F.2d 472, 479 (8th Cir. 1971) (identity of witnesses is information the government is not normally required to supply to the criminal defendant); United States v. Cole, 453 F.2d 902, 905 (8th Cir. 1972) (same).

In amending the Federal Rules of Criminal Procedure in 1975, Congress specifically declined to impose reciprocal discovery obligations for the names and addresses of trial witnesses. It adopted, instead, the Senate and House Conference version of the amendments, "thereby making the names and addresses of a party's witnesses nondiscoverable." H.R. Conf. Rep. No. 414, 94th Cong., 1st Sess. 12 (1975), reprinted in 1975 U.S.C.C.A.N. 713, 716. In

explaining Congressional preference for the non-discoverability of the identities of witnesses, the House Conference report stated:

> A majority of the Conferees believe it is not in the interest of the effective administration of criminal justice to require that the government or the defendant be forced to reveal the names and addresses of its witnesses before trial. Discouragement of witnesses and improper contacts directed at influencing their testimony, were deemed paramount concerns in the formulation of this policy.

Id.

In explaining this policy decision on the floor of the United States Senate, Senator John L. McClellan, a member of the Conference Committee, stated:

> Although it should be obvious, I want to emphasize that the policy choice was directly presented and positively resolved in favor of affording all possible protection and encouragement to witnesses in Federal criminal cases. This includes the ability of the prosecutor to assure a reluctant or fearful witness that his identity will not be divulged prior to appearance at trial. Although there may be unusual cases involving fundamental fairness, the congressional decision on this issue should be taken as clear disapproval of the exercise of so-called inherent power by the courts to fashion local rules or individual orders calling for discovery of witnesses, . . . . except insofar as such discovery may be required to effectuate a party's right to constitutional due process of law.

explaining Congressional preference for the non-discoverability of the identities of witnesses, the House Conference report stated:

> A majority of the Conferees believe it is not in the interest of the effective administration of criminal justice to require that the government or the defendant be forced to reveal the names and addresses of its witnesses before trial. Discouragement of witnesses and improper contacts directed at influencing their testimony, were deemed paramount concerns in the formulation of this policy.

Id.

In explaining this policy decision on the floor of the United States Senate, Senator John L. McClellan, a member of the Conference Committee, stated:

> Although it should be obvious, I want to emphasize that the policy choice was directly presented and positively resolved in favor of affording all possible protection and encouragement to witnesses in Federal criminal cases. This includes the ability of the prosecutor to assure a reluctant or fearful witness that his identity will not be divulged prior to appearance at trial. Although there may be unusual cases involving fundamental fairness, the congressional decision on this issue should be taken as clear disapproval of the exercise of so-called inherent power by the courts to fashion local rules or individual orders calling for discovery of witnesses, . . . . except insofar as such discovery may be required to effectuate a party's right to constitutional due process of law.

Cong. Rec. S. 14301 (July 30, 1975). <u>See</u> <u>also</u> Local Rule 117.1(A)(8)(requiring disclosure of government's witness list seven days before trial).

### 2. These Same Principles Have Traditionally Applied to Cooperating Witnesses

The government recognizes its obligation to identify and provide other information about any cooperating witness it intends to use as a witness at sentencing. As with any prospective witness, however, the government has traditionally not been required to identify such witnesses until seven days before trial. <u>United States v. Bello-Perez</u>, 977 F.2d 664, 670 (1st Cir. 1992); <u>United States v. Reis</u>, 788 F.2d 54, 58 (1st Cir. 1986); <u>United States v. Barrett</u>, 766 F.2d 609, 617 (1st Cir. 1985). <u>See</u> <u>also</u> <u>United States v. Hamilton</u>, 452 F.2d 472, 479 (8th Cir. 1971) (identity of witness is information the government is not normally required to supply to the criminal defendant); <u>United States v. Cole</u>, 453 F.2d 902, 905 (8th Cir. 1972) (same).

### 3. The Obligation of the Government to Disclose the Identity of Cooperating Witnesses

In <u>Roviaro v. United States</u>, 353 U.S. 53, 59 (1957), the Supreme Court recognized the "Government's privilege to withhold from disclosure the identity of persons who furnish information

of violations of law to officers charged with enforcement of that law." The Court noted that an informant's confidentiality serves important law enforcement objectives. Id. at 59. The privilege recognizes the obligations of citizens to communicate their knowledge of the commission of crimes to law enforcement officials and encourages them to perform that obligation by preserving their anonymity. Id.

The privilege, however, is qualified. Id. at 60-61. It must give way where the disclosure of an informant's identity or the contents of his communications is: (1) relevant or helpful to the defense of the accused; or (2) essential to a fair determination of a cause. Id. The Court declined to adopt rigid guidelines as to when the privilege should apply or when required disclosures are to be made. Id. at 62. Instead, the Court instructed lower courts to balance the public interest in protecting the flow of information against the individual's right to prepare his defense given the particular circumstances of each case. Id. at 62; United States v. Formanczyk, 949 F.2d 526, 529 (1st Cir. 1991); United States v. Reis, 788 F.2d 54, 58 (1st Cir. 1986) (government not required to provide pretrial disclosure of the identity of its trial witnesses).

> **4. Under Local Rules 116.2 and 116.6, Disclosure of the Identity of the Cooperating Witnesses Should Be Deferred until the Time of Sentencing Due to the Violent Nature of the Defendant and His Gang**

The principles governing the disclosure of cooperating witnesses and confidential informants are now codified in the Local Rules of this Court. Under Local Rule 116.2, the identity of any person whom the government anticipates calling as a witness and who has received any promise, reward, or inducement is to be presumptively made at the time of the government's initial automatic disclosure. The government has the right to decline to make that disclosure, however, whenever it concludes that the disclosure would be detrimental to the interests of justice. See Local Rule 116.6(A). Where, as here, the government has made a declination, it has the burden of demonstrating why such disclosure should not be made. Id.

In this case, the government concedes that disclosure of the identity of the cooperating witnesses will need to be made prior to the sentencing hearing; it only questions when. Because of the defendant's demonstrated proclivity for firearms and firearm-related violence and the violent nature of the Latin Kings, the government requests that disclosure be deferred until seven days before trial in order to protect the safety of the cooperating witnesses and their families. That is appropriate in this case, particularly in view of the fact that the defendant has already plead guilty.

As the audiotape and the other evidence before the court make clear, the defendant is a member of a violent street gang

which has advocated violence against members of rival gangs and declared law enforcement agents to be their enemies. The defendant is a willing and active leader of the Latin Kings who dealt in cocaine throughout the investigation, and is a self-proclaimed gun merchant who was constantly associated with guns. Because the evidence shows that the defendant and his Latin King compatriots (many of whom remain on the street) are armed with a virtual arsenal of weapons, the court should not place the safety of the cooperating witnesses or their families at risk prior to the sentencing hearing. E.g., United States v. Tejeda, 974 F.2d 210, 215 (1st Cir. 1992)(in upholding conviction in case in which the government disclosed identity of informant three days *before trial*, court noted the important interest in protecting an informant's safety); Government of the Virgin Islands v. Martinez, 847 F.2d 145 (3rd Cir. 1988)(potential danger to informant is an appropriate consideration in considering disclosure of identity). See generally United States v. Wray, 763 F. Supp. 752 (S.D.N.Y. 1991)(court took judicial notice of danger to informants in many narcotics cases).

Moreover, any claim that deferring disclosure would unduly prejudice the defense is belied by the substantial discovery already provided to the defendant and by the fact that the defendant already stands convicted. The government has already provided the defendant with a substantial amount of information

about the cooperating witness who made the cocaine purchases in this case and the crimes with which the defendant is charged. As the discovery letter referenced in the defendant's motion makes clear, the government has also already produced redacted <u>Giglio</u> type information regarding this cooperating witness which will allow the defendant to assess the witness and prepare for cross-examination. The government has also provided the defendant with an extraordinary number of details regarding the many transactions in which the defendant sold cocaine and talked about his drug dealings and his connections with his co-conspirators to the cooperating witness including all FBI-302 reports and DEA-7's with certifications and back up documentation. The government has also provided the defendant with copies of the audio and videotapes made during the course of the investigation of the defendant and made other tapes regarding the underlying investigation available. Although comparable information about other potential witnesses at the sentencing hearing has not yet been made, it should be given 7 days before trial so that the safety of these other witnesses and their families can be protected.

### 5. Conclusion

The defendant is a active and enthusiastic leader of one of the most notorious street gangs in Massachusetts. He has participated in the activities of that criminal organization,

which has freely acknowledged how it deals with individuals who cooperate with law enforcement. The audio and video tapes made of the defendant and his co-conspirators confirm their involvement in drug trafficking, in the Latin Kings, and of their access to firearms. Because of the serious risk that disclosure of further information about the cooperating witnesses would pose to the safety of the cooperating witness and their families, the emergency motion should be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

By: _____ 6/1/04
JOHN A. WORTMANN, JR.
Assistant U.S. Attorney
One Courthouse Way
Boston, MA
(617) 748-3207

CERTIFICATE OF SERVICE

I, JOHN A WORTMANN, JR., Assistant U.S. Attorney, do hereby certify that I have this 1st day of June, 2004, served the copy of the foregoing by mail (clerk's office box) to counsel for Carmelo Rodriguez.

_____
JOHN A. WORTMANN, JR.
Assistant U.S. Attorney