UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------------------x
:
UNITED STATES OF AMERICA         :
:
vs.                              :    Crim. No. 04-10048-NG
:
CARMELO RODRIGUEZ,               :
:
Defendant.                   :
:
------------------------------------------------x

### DEFENDANT CARMELO RODRIGUEZ'S SENTENCING MEMORANDUM

Defendant Carmelo Rodriguez ("Rodriguez") submits this memorandum to aid the court at Rodriguez's sentencing hearing, scheduled for July 9, 2004. Rodriguez respectfully requests, based on the facts and arguments presented below, that the Court sentence him to a split sentence of 4 months' imprisonment (time served) and 4 months' home confinement, with significant conditions of supervised release that include further home confinement, education requirements, and psychological counseling.

1.   **Background**

On April 8, 2004, Rodriguez entered a plea of guilty to several substantive counts in which he is charged with participating in a drug transaction, as well as to a conspiracy count in support of which he has admitted providing favors to at least one other co-defendant engaged in similar transactions. At the time of the offense, Rodriguez was 20 years of age. Attached hereto as Exhibit A is a report of Dr. Paul Spiers, a psychologist who concludes that a significantly reduced mental capacity substantially contributed to the commission of the offense. Exh. A at 9. Dr. Spiers also concludes that Rodriguez can be rehabilitated, which would be accomplished most effectively through "appropriate structure, proper social modeling, consistent discipline and

the opportunity to improve his academic and reasoning skills." *Id.* at 10.

The conclusions of Dr. Spiers are supported by objective testing and subjective interviews. His report sets forth the context of Rodriguez's dysfunctional upbringing that led to his recruitment into the so-called Latin Kings at the age of 15. *Id.* at 5-6. According to Dr. Spiers, the cognitive testing of Rodriguez shows that "his mental age at that time could not have been any more than that of a pre-adolescent, with verbal intellectual skills equivalent to a nine year old." *Id.* at 6. Rodriguez grew up in a highly unstable environment, moving frequently and without a father figure. *Id.* at 5-6. His mother is in the final stages of terminal cancer.

As a result of the investigation, the government seized approximately 158.5 grams of cocaine from Rodriguez and his co-defendants. The government's key cooperating witness has claimed that Rodriguez flushed 3 ounces (approximately 84 grams) of cocaine during a police search several weeks before the conclusion of the investigation. (The government seized approximately 53.5 grams (of the 158.5 seized grams of cocaine) after the date of the purported flush, which poses a potential issue of double counting under the government's analysis.)

In an effort to elevate the quantity beyond what the investigation actually revealed, the government attempts to rely on unreliable boasting by Rodriguez and others. As Dr. Spiers has explained, "[s]uch behaviors by the defendant as boasting about himself or exaggerating his accomplishments, even if criminal, would serve to ensure such distance" from close relationships while seeking artificially to elevate his "stature to help allay his anxiety, poor self-image or distrust." *Id.* at 7. At any rate, as discussed in Point 2, *infra, Blakely v. Washington*, No. 02-1632, 2004 WL 1402697 (June 24, 2004) precludes any such upward adjustment at this stage.

To seek an upward adjustment for Rodriguez's role in the offense, the government relies

extensively on an unidentified cooperating witness as to whom no *Giglio* materials has yet been disclosed. The government simply lacks reliable evidence from which to conclude that such an adjustment is warranted. At any rate, as discussed in Point 2, *infra*, *Blakely* precludes any such upward adjustment at this stage.

The government also has provided the United States Probation Office with significant innuendo regarding efforts to obtain firearms from Rodriguez and his codefendants, as well as various remarks regarding entirely unproven acts of violence. In reality, the government is fully aware that, notwithstanding arduous efforts by its investigators for more than a year, Rodriguez neither produced a firearm nor otherwise arranged for an actual sale of one. Whatever the flaws, even pre-*Blakely*, the United States Sentencing Guidelines (the "Guidelines") never permitted upward adjustments based on pure speculation and innuendo.

As explained by the United States Probation Office in the PSR, Rodriguez has never previously served any term of imprisonment other than pretrial detention. His criminal history is relatively minor and primarily the result of juvenile offenses. This matter has served as a wake-up call for Rodriguez. Thoughtful and restrictive conditions of supervised release could serve the best role in the rehabilitation process.

2.  ***Blakely v. Washington***

On June 24, 2004, in *Blakely v. Washington*, No. 02-1632, 2004 WL 1402697 (June 24, 2004), the United States Supreme Court revisited the tension between the right to a jury trial under the Sixth Amendment to the United States Constitution, and sentencing enhancements under determinate sentencing guidelines. Previously, in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that, under the Sixth Amendment, "[o]ther than the fact of a prior

conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. In *Blakely*, the Court treated a 53-month guideline maximum for the offense to which a defendant pleaded guilty as the functional equivalent of a statutory maximum for purposes of the *Apprendi* rule.

The *Blakely* Court focused on the applicable guideline maximum for the facts to which the defendant admitted at his change of plea colloquy. *Blakely*, 2004 WL 1402697 at *2. Though sentenced to 90 months' imprisonment based on a guideline sentencing enhancement for acting with deliberate cruelty, "[t]he facts admitted in his plea, standing alone, supported a maximum sentence of 53 months" under the sentencing guidelines for the State of Washington. *Id.* The Supreme Court explained that the 53-month guideline maximum must be treated as the statutory maximum for *Apprendi* purposes:

> ...The facts supporting th[e enhancement] finding were neither admitted by petitioner nor found by a jury. The State nevertheless contends that there was no *Apprendi* violation because the relevant 'statutory maximum' is not 53 months, but the 10-year maximum for class B felonies [under Washington law]. It observes that no exceptional sentence may exceed that limit. Our precedents make clear, however, that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*. ... [T]he relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment' and the judge exceeds his proper authority.
> The judge in this case could not have imposed the exceptional 90-month sentence solely on the basis of the facts admitted in the guilty plea.

*Id.* at *4-5 (citations omitted). "Because the State's sentencing procedure did not comply with the Sixth Amendment, petitioner's sentence is invalid." *Id.* at *6.

In future cases, the *Blakely* holding will likely cause the government to set forth in indictments those facts supporting sentencing enhancements or to seek *Apprendi/Blakely* waivers from defendants who plead guilty. *See Blakely*, 2004 WL 1402697 at *8 ("nothing prevents a defendant from waiving his *Apprendi* rights"). In the present matter, however, the government chose not to seek any waiver as part of any plea agreement (in fact, the government never offered any sort of plea agreement), and has failed to charge facts such as a quantity of cocaine or the role of the defendant, failed to submit such factual issues to a jury, and failed to obtain any admissions from the defendant to support findings on these issues at sentencing. In addition, there has not been a waiver, let alone a knowing and voluntary waiver, by Rodriguez of his rights under *Apprendi* and *Blakely*. Because jeopardy attached upon the acceptance of Rodriguez's guilty plea, under the Double Jeopardy Clause, any effort by the government to cure its failures would simply be untimely at this stage of the proceeding.

The *Blakely* decision applies to the United States Sentencing Guidelines at issue in the present matter as much as to the Washington guidelines. While the *Blakely* majority noted in passing that the federal sentencing guidelines were not before the Court, *id.* at 6 n. 9, a dissenting opinion recognized that the consequences of the majoirty's decision will be "far reaching" because "[t]he structure of the Federal Guidelines likewise does not, as the Government half-heartedly suggests, provide any grounds for distinction," *id.* at *16 (Kennedy, J., dissenting). The dissent explained that any "structural differences that do exist make the Federal Guidelines more vulnerable to attack." *Id.* "The fact that the Federal Sentencing Guidelines are promulgated by

an administrative agency nominally located in the Judicial Branch is irrelevant to the majority's reasoning" because "[t]he Guidelines have the force of law; and Congress has unfettered control to reject or accept any particular guideline." *Id.* "This means that the hard constraints found throughout chapters 2 and 3 of the Federal Sentencing Guidelines, which require an increase in the sentencing range upon specified factual findings, will meet the same fate" as did the enhancement in *Blakely*. *Id.*

Even more so than did the statutory scheme at issue in *Blakely*, the particular statutory scheme presently at issue supports the conclusion that enhancements based on drug amount should be treated as elements of separate offenses. In particular, 21 U.S.C. § 841(b) sets forth different penalty ranges based on different quantities of drugs. The statutory maximum changes with each level of increase. Without a particular quantity in an indictment, the penalty range is 0-20 years' imprisonment, *see* 21 U.S.C. § 841(b)(1)(C), for more than 500 grams of cocaine the penalty increases to 5-40 years, *see* § 841(b)(1)(B), and, for more than 5 kilograms the penalty increases to 10-life in prison, *see* § 841(b)(1)(A). Unlike the modest change in a mandatory minimum at issue in *Harris v. United States*, 536 U.S. 545 (2002), the statutory offense at issue here involves "steeply higher penalties" at each level, including geometric increases in statutory maximums. *Id.* at 554 (addressing modest increases of statutory *minimums* related to weapon possession).

Unlike in *Blakely*, the parties in *Harris* did not present to the Court any question regarding the application of *Apprendi* when a mandatory minimum or sentencing enhancement exceeds a *guideline range maximum*. The *Harris* Court focused only on the *statutory maximum* of life imprisonment on the facts before it. In *Blakely*, the Court resolved any such open issues by

6

narrowly construing *Harris* as permitting sentencing judges to apply mandatory minimums by a preponderance of the evidence at sentencing only if doing so "does not authorize a sentence in excess of that otherwise allowed for [the underlying] offense." *Blakely*, 2004 WL 1402697 at *5 (citing favorably to *Harris* for that proposition). The *Blakely* decision further confirmed that *guideline maximums* constitute the functional equivalent of statutory maximums for purposes of the *Apprendi* analysis. *Blakely*, 2004 WL 1402697 at *7 (analyzing issue without regard for label of maximum penalty as a "guideline" maximum or a "statutory" maximum).

Accordingly, the Sixth Amendment prevents an offense level adjustment for any particular quantity of cocaine or role in the offense because those issues were nether submitted to a jury nor admitted to by the defendant at his change-of-plea colloquy.

3.  **Rodriguez's Total Offense Level Should Be 10**

As described above, under *Blakely*, the government cannot proceed at sentencing to establish enhancements based on facts beyond the admissions by Rodriguez at the change of plea colloquy. Establishing a particular quantity of drugs for sentencing requires a particularized showing of a reasonably foreseeable amount from a defendant's vantage point. *United States v. Miranda-Santiago*, 96 F.3d 517, 524 (1st Cir. 1996) (Gertner, J.). An upward adjustment for supervisory role also requires specific evidence demonstrating he "exercised control over [other] persons or was otherwise responsible for organizing them in the commission of the offense." *United States v. Frankhauser*, 80 F.3d 641, 654 (1st Cir. 1996) (reversing imposition of upward role adjustment based on insufficient findings). By choosing not to enter into a plea agreement with fair and acceptable stipulations on these issues, and by not seeking specific admissions from

7

Rodriguez at the change of plea colloquy, the government has foreclosed its ability to seek these upward adjustments at sentencing.

Pursuant to USSG § 2D1.1, Drug Quantity Table ¶ 14, a base offense level of 12 applies to Rodriguez because, under *Blakely* (discussed *supra* Point 1), there is no specific quantity of drugs for which Rodriguez has been convicted. Under § 3E1.1(a), Rodriguez is entitled to a decrease in the offense level by 2 levels based on his acceptance of responsibility. Accordingly, the total offense level for Rodriguez is 10.

### 4. Criminal History Category

The PSR sets the criminal history category for Rodriguez at III. The underlying criminal history score includes primarily minor juvenile offenses. In fact, two of the convictions appear to have occurred without Rodriguez's participation in the criminal justice proceedings, or the underlying offense, because he was incarcerated awaiting trial in New Hampshire on charges for which he was ultimately acquitted. The PSR also adds 2 points to Rodriguez's criminal history score based on an uncharged transaction that occurred on February 7, 2004, days after probation had been ordered on an unrelated state conviction. As reflected in the PSR, Rodriguez did not even yet meet with his probation officer to commence the probation process.

Rodriguez has objected to the calculation of a category III based on these flaws in the PSR. Either because of errors of law, or the significant overstatement of Rodriguez's criminal history category, the proper category under which Rodriguez should be sentenced should be II. *See United States v. Mejia*, 278 F. Supp. 2d 55, 62-63 (D. Mass. 2003) (Gertner, J.) (finding downward departure appropriate because "had all constitutional processes been working, as they were supposed to—his criminal history score should have been reduced by four points, earning

8

him a criminal history II rather than criminal history III range"); *United States v. Trask*, 143 F. Supp. 2d 88, 93 (D. Mass 2001) (Gertner, J.) (departing one level in criminal history category where there were no prior convictions for violent crimes and several past offenses simply arose from "a problem which had never been seriously addressed"); *United States v. Lacy*, 99 F. Supp. 2d 108, 122-23 (D. Mass. 2000) (decreasing criminal history category where the prior "record is largely non-violent"); *United States v. Leviner*, 31 F. Supp. 2d 23, 31-34 (D. Mass. 1998) (departed downward from criminal history category based an overstated culpability and likelihood of recidivism where primarily motor vehicle violations and minor drug possession offenses).

5.  **The Court Should Grant Rodriguez A Downward Departure Because A Significantly Reduced Mental Capacity Substantially Contributed to the Commission of the Offense**

Under the Guidelines, factors that might constitute grounds for a downward departure are divided into three categories: (1) prohibited factors, which can never be relied upon as the basis for a downward departure (such as race, sex, or national origin); (2) discouraged factors; and (3) encouraged factors. *See United States v. Grandmaison*, 77 F.3d 555, 560 (1st Cir. 1996); *see generally Koon v. United States*, 518 U.S. 81, 92-96 (1996).

Section 5K2.13 of the Guidelines encourages downward departures when a defendant committed the offense of conviction while operating under a diminished mental capacity. *See United States v. Mansoori*, 304 F.3d 635 (7th Cir. 2002) (vacating sentence for further consideration of downward departure under § 5K2.13 because sentencing court erred in conclusion that drug distribution was a crime of violence for which downward departures were categorically precluded under § 5K2.13). A review of the attached report of Dr. Spiers reveals substantial grounds for a downward departure in the present matter based on Rodriguez's

9

significantly diminished mental capacity and its substantial contribution to the offense. *See* Exh. A. Underlying the mental defect are extraordinary verbal reasoning difficulties reflected in objective testing, extremely limited education, the lack of structure in his early development, and the negative effects of gang recruitment on him at the age of 15. *See id., passim.* Such facts provide this Court with broad discretion to depart downward from any applicable guideline range.

### 6. The Court Should Grant Rodriguez A Downward Departure Because of His Extraordinary Efforts to Achieve an Early Disposition of this Matter

Section 5K3.1 of the Guidelines purports to provide for a downward departure of "not more than 4 levels pursuant to an early disposition program authorized by the Attorney General of the United States and the United States Attorney for the district in which the court resides." By so doing, the Guidelines recognize the value of providing defendants with an incentive to plead guilty promptly. Yet, by placing the availability of such a downward departure entirely in the discretion of each United States Attorney for each district, in a manner that defeats the objectives of uniformity and proportionality, § 5K3.1 exceeds the authority of the Sentencing Commission and violates the separation-of-powers doctrine. Unlike cooperation with the government by a defendant under § 5K1.1, courts retain at least as substantial an interest as do prosecutors in encouraging early dispositions. Hence, § 5K3.1 should be treated as an encouraged factor for a downward departure of 4 levels for defendants who plead guilty promptly, regardless of the availability of an early disposition "program" in any particular district.

Here, not only has Rodriguez entered a prompt guilty plea, but he actually made extraordinary efforts to achieve an early disposition of the matter, saving the Court (and the government) significant time and expense. The investigation into Rodriguez's conduct resulted in

indictments against 19 individuals. Rodriguez pleaded guilty long before any of the other 18 defendants and did so without even the benefit of a plea agreement. Accordingly, Rodriguez is entitled to a downward departure of up to 4 levels for the extraordinarily early disposition of the prosecution against him.

## Conclusion

Based on the foregoing, the applicable guideline range is within Zone C, at 8-14 months, for which a split sentence is authorized. The goal of rehabilitation would be best served by establishing significant conditions of supervised release that require additional home confinement, mandatory psychological counseling, and educational obligations.

Respectfully Submitted,

By: _____
Barry S. Pollack (BBO # 640625)
DONNELLY, CONROY & GELHAAR, LLC
One Beacon Street 33rd Floor
Boston, MA 02108
(617) 720-2880

Attorneys for Defendant Carmelo Rodriguez

Dated: June 30, 2004

## CERTIFICATE OF SERVICE

I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail/by hand

Date: 6/30/04 _____