## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA     )
                                )
          v.              )     Criminal No. 04-10048-NG
                                )
                                )
CARMELO RODRIGUEZ           )

## GOVERNMENT'S MEMORANDUM RE: BLAKELY ISSUES[1]

The last 25 days have been a remarkable time for federal criminal proceedings. Faced with a Supreme Court decision that some believe could change the way some criminal cases will be handled, business in many criminal dockets has simply stopped while judges struggle to assess Blakely's implications and formulate their respective (and often disparate views) on the system that will replace the operation of the Federal Sentencing Guidelines as they are presently structured. Those efforts of course assume both that: (i) that the Supreme Court will ultimately hold that Blakely applies to the Federal Sentencing Guidelines; and (ii) that Congress does not end the debate by statute. See

---

[1] The undersigned received earlier today Carmelo Rodriguez' Blakely memorandum.. Although much of that memorandum deals with the issues set forth herein, it also raises other issues (ex post facto and double jeperdy) that the government will address either by responsive memo or at argument on July 21, 2004.

"Legal Quagmire: High Court Ruling Unleashes Chaos Over Sentencing (Wall Street Journal, 7/14/04) at 4 (discussion of bill being considered in Congress that would eliminate upper level on all guideline ranges and thereby avoid Blakely issues).

By day 26, at least two things seem clear.  The first is that many of the assumptions made in the immediate aftermath of Blakely were both simplistic and potentially wrong.  For example, pundits scoffed at the government's position (consistently held since June 24) that Blakely does not apply to the Federal Sentencing Guidelines.  Yet, to date, a number of federal appellate court judges have reached exactly that result.  See United States v. Pineiro, ---- F.3d ----, 2004 WL 1543170 (5th Cir.(La.) Jul 12, 2004) (refusing to hold Federal Sentencing guidelines unconstitutional under Blakely); United States v. Booker, 2004 WL 1535858 (7th Cir. July 9, 2004)(Easterbrook, J. dissenting)(same).  See also Spero v. United States, 2004 WL 1516863 (11th Cir. July 8, 2004) (per curiam)(Blakely does not apply to mandatory minimum sentences required by federal criminal statute).

Many of these same pundits also predicted that Blakely would produce a windfall to many defendants.  Once again,

those prognostications now appear to be have been hasty.
See United States v. Croxford, --- F.Supp.2d ----, 2004 WL
1462111 (D.Utah Jun 29, 2004)(although Court concluded that
Blakely was unconstitutional, Court imposed same sentence as
would have applied under the guidelines); United States v.
Maflavi (defendant who had lied to FBI agents sentenced to
statutory maximum even after Court declared the Sentencing
guidelines to be unconstitutional)(reported in Sentencing
Law and Policy).

The second thing now clear is that issues raised by
Blakely are headed to the Supreme Court as a result of a
nationwide effort by some of our most respected appellate
judges.  Although, as set forth above, appellate courts have
to date disagreed on the constitutionality of the Federal
Sentencing Guidelines, all have concurred on the need for
prompt Supreme Court resolution of Blakely's reach and
effect.  See Booker, 2004 WL at *1 (Posner, J. and Kanne, J)
("we have expedited our decision...our hope is that an early
opinion will help speed the isssue to a speedy resolution");
Id. at *11 (Easterbrook, J. dissenting)("Today's decision
will discombobulate the whole criminal-law docket. I trust
that our superiors will have something to say about this.
Soon."); United States v. Penaranda, 2004 WL 1551369, *6

3

(2nd Cir. July 13, 2004) ("We are convinced that a prompt
and authoritative answer to our inquiry is needed to avoid a
major disruption in the administration of criminal justice
in the federal courts-- disruption that would be unfair to
defendants, to crime victims, to the public, and to the
judges who must follow applicable constitutional
requirements").  That likelihood underscores the need for
judicial restraint in this area to allow appellate guidance
to be developed and thereby minimize the negative impact
that contrary rulings within a district may have on the
administration of justice.  Compare United States v. Moran,
02-10136-REK (Judge Keeton, while refusing to declare any
portion of the guidelines unconstitutional, refused to
permit government to present evidence of overdose even
though defendant had waived right to have overdose issue
presented to a jury according to reasonable doubt standard)
with United States v. Ware 02-10295-JLT (Judge Tauro ruled
that guidelines are enforceable until the United States
Supreme Court says otherwise).  See generally "Federal
Sentences Here Are in Limbo after Ruling" St. Louis Post
Dispatch (July 13, 2004) (Federal District Court Judge
Michael J. Reagan quoted as saying he has continued all
sentencings untiol September or October to allow the Supreme

4

Court to address <u>Blakely</u>'s application to the Federal
Sentencing Guidelines"); <u>United States v. Thompson</u>, Cr. 03-
10087-02 (S.D.W.Va. July 14, 2004)(Goodwin, J.)(in
recognition of "paramount importance" of "consistent
application of the law... in sentencing matters prompter
Judge Goodwin, author of the <u>Shamblin</u> decision, to continue
all sentencings until October except for individual matters
upon motion and good cause shown).[2] <u>See also</u> <u>Figueroa</u> v.
<u>Rivera</u>, 147 F.3d 77, 81 (1st Cir. 1998) (noting that the
Supreme Court has "admonished the lower federal courts to
follow its directly applicable precedent, even if that
precedent appears weakened by pronouncements in its
subsequent decisions").

---

[2] The government respectfully submits that this is not
a case in which prompt action is required.  According to the
defendant, <u>Blakely</u> means that his GSR has magically been
transformed to 8-14 months (the numbers in the PSR are 92-
115 months).  Assuming that the Court were to agree with
every one of the defendant's arguments and sentence him at
the low end of the range (which by itself, would render the
defendant ineligible for any programming offered by the
Bureau of Prisons due to the brevity of his remaining time),
his release date (barring a sentence of probation or home
confinement or the allowance of any of the downward
departures) would still be in October.  If such a sentence
were to be appealed by the government, the defendant would
also remain subject to detention pursuant to 18 U.S.C.
§3143(c) even assuming that no further indictments were
brought.

Notwithstanding this pressing need for judicial
restraint, the court has requested the government's views on
certain <u>Blakely</u>-related issues as they apply in this case.
They are set forth more fully below.  After reviewing the
facts in this case (in which the PSR concluded that Carmelo
Rodriguez' GSR is 92-112 months but where Rodriguez suggests
that <u>Blakely</u> has shrunk the GSR to 8-14 months), the
government will demonstrate that:

(i) it is unwise for this Court to immediately consider
<u>Blakely</u>'s application to the Sentencing Guidelines in this
case-- rather, any such decision should be deferred for a
reasonable time to await further developments from appellate
courts;

(ii) if the Court considers <u>Blakely</u>'s application to
the Sentencing Guidelines now, it should conclude that
differences between the Washington statutes at issue there
and the federal Sentencing Guidelines show that the
guidelines are not unconstitutional in this case and that,
in any event, <u>Blakely</u> does not affect the Court's obligation
to determine the applicability of the mandatory minimum
contained in 21 U.S.C. §841(b)(1)(B) in this case; and,

(iii) if the Court concludes that <u>Blakely</u> applies to the
Federal Sentencing Guidelines, then the Court should apply
settled severability principles, reject the Guidelines in
their entirety,  and sentence the defendant within the
applicable 60-240 month statutory range using pre-guideline
indeterminate principles and the guidelines as an advisory
source.

<u>See, e.g.</u>, <u>United States v. Montgomery</u>, 2004 WL 1562904 (6th
Cir. July 14, 2004) ("to comply with Blakely and the Sixth
Amendment, the mandatory system of fixed rules calibrating

sentences automatically to facts found by judges must be displaced by an indeterminate system in which the Federal Sentencing Guidelines in fact become "guidelines" in the dictionary-definition sense").

**I.  THE GOVERNMENT'S CASE AGAINST CARMELO RODRIGUEZ, A/K/A "KING CARMELO"**[3]

On February 21, 2004, a grand jury sitting in this district returned a total of ten indictments against individuals alleged to be members and associates of the Almighty Latin King Nation, a nationwide street gang with a substantial presence in Massachusetts ("the Latin Kings"). The indictments charged a total of 17 men with a variety of drug and firearm charges, all of which were alleged to have been committed in Lawrence and Lowell, Massachusetts area. See PSR at pp 3-6.

These indictments (and others) resulted from a two-year investigation conducted by the FBI' North Shore Gang Unit. During it, cooperating witnesses repeatedly made purchases of cocaine, cocaine base, and heroin from members and associates of the Latin Kings.  All of the deals (and many of the conversations leading up to them) were consensually

---

[3]  Facts set forth in this memorandum come from the PSR unless otherwise indicated.

recorded.  Many of the deals (including all of the deals
involving Carmelo Rodriguez) were also captured on video.
PSR at ¶¶2-3.  All of the drugs were also field tested and
certified (as to both weight and type) by the Drug
Enforcement Administration's Northeast Regional Laboratory.[4]

Carmelo Rodriguez was named in one of these
indictments.  See United States v. Rodriguez, Cr. 04-10048-
NG.  Between October 3, 2003 and February 7, 2004, a CW
made 15 cocaine purchases from Rodriguez and his three co-
defendants (Ricardo Rosario, a/k/a "King BND", Giecliff

---

[4] The investigation also disclosed substantial amounts
of information regarding the organization and structure of
the Latin Kings.  PSR at 5.  The Massachusetts Chapter of
the Latin Kings constitutes a group of affiliated street
gangs with hundreds of members in Lawrence, Lowell and other
cities.  The Latin Kings operate local chapters throughout
the state including chapters inside many correctional
facilities. Many members are involved in a broad range of
illegal activities including drug trafficking and crimes of
violence. Information regarding the Latin Kings is set forth
in a detention affidavit filed at the beginning of this
case.
    The government believes that all of the the information
set forth in that affidavit remains accurate except insofar
as it described an incident suggesting that there was
centralized control over drug trafficking in the
Lawrence/Lowell area. See Detention Affidavit at ¶17.  The
government is not alleging that there was institutional
control over all drug trafficking by the Latin Kings to
control drug trafficking by its members and may have been a
ruse by certain individuals (including a CW in this case)
simply to obtain money from the FBI.

8

Rodriguez, a/k/a "King Bear," and Jonathan Deleon, a/k/a "King Danger"). All transactions were hand-to hand sales of various amounts of cocaine up to one ounce. All of the sales were surveilled and recorded. The conversations that took place both before and during the sales confirmed not only that the sales were taking place, but also the interrelationship among the defendants and that the charged sales were only a small part of the their cocaine trafficking.

Based on all of the evidence disclosed to United States Probation for inclusion in the PSR, the government sought to hold Rodriguez responsible for at least 500 grams of cocaine. This figure was based on Rodriguez' own sales to the CW (totaling approximately 160 grams), sales of his co-defendants, and historical evidence coming from, among other places, statements that Rodriguez made on video during individual cocaine sales. These statements included acknowledgments: (i) that Rodriguez was selling approximately 8 ounces of cocaine per week (PSR at 61); (ii) that Rodriguez had flushed more cocaine worth $6,000 down the toilet when the Lowell Police came looking for co-defendant Jonathan Deleon on New Year's day (PSR at 103); and, (iii) that Rodriguez was supplying cocaine to co-

9

defendant Ricardo Rosario--who in turn admitted on tape that
he was selling 4-5 ounces of cocaine per week on his own
(PSR at ¶¶66 (Rodriguez acknowledges that he was fronting
Ricardo Rosario ounces of cocaine and that the cocaine the
CW had purchased from Rosario came from Rodriguez), 77
(Rosario admitted that he was selling 4-5 ounces of week and
that Rodriguez was bringing him "mad business").  The
government also argued that Rodriguez should be assessed a
role enhancement under U.S.S.G. §3B1.1 because of his
leadership position in the drug trafficking described.

    The current PSR in this case was issued on July 14,
2004.  After considering all of the information in this case
(including the many objections filed by Rodriguez), U.S.
Probation concluded that Rodriguez was personally
responsible for one thousand nine hundred eighty-five
(1,985.0) grams of cocaine (which it described as an
"extremely conservative estimate") and that he was therefore
subject to the five-year mandatory minimum sentence
contained in 21 U.S.C. § 841(b)(1)(B).[5]  PSR at ¶¶125-26,

---

    [5] As is indicated more fully below, this conclusion is
correct regardless of the Court's conclusion regarding the
continued viability of the guidelines in light of Blakely.
See Blakely at 124 S. Ct at 2538 (affirming continuing
validity of McMillan).

Addendum at 2 (United States Probation Office noted that, even if statements made by Rodriguez on tape were boasting, "its *extremely* conservative estimates accounts for any boasting"). The Probation Office also assessed Rodriguez a three-level enhancement for his role in the offense. PSR at 128. After giving Rodriguez three levels for acceptance of responsibility, the PSR concluded that the total offense level is 26. PSR at ¶133.

The PSR also described Rodriguez criminal history in detail. That criminal history included two adjudications of delinquency (one of which was scoreable) and three adult convictions. PSR at ¶¶134-139. The PSR assessed Rodriguez 8 Criminal History Points, resulting in him being placed in CHC IV and having an applicable guideline range of 92-115 months. PSR at ¶143.

The defendant disagrees with these calculations at every imaginable level. He denies being a leader of any kind and claims that no role adjustment is appropriate. He rejects Probation's drug weight calculations, claiming that he is only responsible for somewhere between 100 and 499 grams of cocaine. He disputes certain aspects of his criminal history and suggests that he also is entitled to various downward departures. See Defendant's Objections 1

11

through 35.  The government is prepared to meet all of these objections and requests at a sentencing hearing and maintains that the guideline calculations in the PSR are both conservative and correct.

The real issue for present purposes, however, is defendant's objection 36 dealing with <u>Blakely</u>. <u>See</u> PSR Addendum at 19.  In it, Rodriguez claims that, based on when his plea hearing took place (i.e., before June 24, 2004), his sentencing is governed by <u>Blakely</u>. <u>Id</u>.  He claims that <u>Blakely</u> sends his Base Offense Level from 26 to 12 and that the court cannot impose any role adjustment. He says he is entitled to acceptance of responsibility and that his Criminal history category is really II.  Based on all of these issues, Rodriguez claims that his guideline range is 8-14 months and that he should be released from prison after serving 6 months.  This represents a 93% reduction from the low end of the guideline range set forth in the PSR.

## II.  <u>BLAKELY</u> DOES NOT INVALIDATE THE FEDERAL SENTENCING GUIDELINES

Consideration of the <u>Blakely</u> issues requires this court to examine a number of distinct (yet important) issues. Before considering any substantive issues, the Court must first consider whether district court action in this (and

12

other cases) is appropriate pending further word from the
Supreme Court.  If the Court concludes that it is, the Court
should then examine whether <u>Blakely</u> applies to the Federal
Sentencing guidelines and, if so, to what extent (i.e, are
the guidelines severable and what impact does <u>Blakely </u>have
on judicial factfinding on mandatory minimum sentences).
Assuming the Court concludes that the guidelines are
unconstitutional and the affected portions cannot be severed
from the balance of this "holistic system," the Court must
then also figure out what impact or influence the guidelines
should have in placing Carmelo Rodriguez within the 60-240
month sentence that the government believes is applicable to
this case.

> **A.   This Court is Bound by Supreme Court and First
>       Circuit Precedent Upholding the Guidelines.**

In <u>Blakely</u> v. <u>Washington</u>, 124 S.Ct 2531 (June 24,
2004), the Supreme Court applied <u>Apprendi</u> v. <u>New Jersey</u>, 530
U.S. 466, 490 (2000), to invalidate a sentencing
enhancement, imposed pursuant to state law, that increased
the sentence beyond the range authorized by Washington
state's statutory sentencing guidelines regime.  The Court
explained that, because the facts supporting the enhancement
were "neither admitted by [the defendant] nor found by a

jury," the sentence violated the Sixth Amendment right to trial by jury.  2004 WL 1402697, at *4.

Blakely did not invalidate the federal sentencing Guidelines, nor did it hold that its rule applies to the Guidelines.[6]  See 2004 WL 142697, at *6 n.9 ("[t]he Federal Guidelines are not before us, and we express no opinion on them"); see also Apprendi, 530 U.S. at 497 n.21 (same). Indeed, in Apprendi itself, the Court expressed no view on the Guidelines beyond "what this Court has already held." Ibid. (citing Edwards v. United States, 523 U.S. 511, 515 (1998)).

What the Court has "already held" about the Guidelines therefore continues to provide the governing principle for this court -- and Supreme Court rulings have consistently upheld the Guidelines against constitutional attack and underscored their unique status within our constitutional scheme.  See, e.g., Mistretta v. United States, 488 U.S. 361 (1989).  Indeed, the Court has found that, so long as a sentence does not exceed the statutory maximums established

---

[6]United States v. Pineiro, 2004 WL 1543170 (5th Cir.) (July 12, 2004)(cannot conclude that Blakely applies to federal sentencing guidelines); but see, United States v. Booker, 2004 WL 1535858 (7th Cir.) July 9, 2004)(Blakely applies to the federal sentencing guidelines.)

14

by Congress for the offense of conviction, a Guidelines

sentence can (in fact, sometimes must) be based on judge-

found conduct not proved to a jury, see Edwards v. United

States, 523 U.S. 511, 514-15 (1998); conduct not charged in

the indictment, see Witte v. United States, 515 U.S. 389,

399-401 (1995); and conduct of which a defendant is

acquitted but is established by a preponderance of the

evidence.  See United States v. Watts, 519 U.S. 148, 156-57

(1997) (per curiam).  Moreover, the Court has explicitly

held that courts are bound not only by the Guidelines, but

by their policy statements and commentary as well.  Stinson

v. United States, 508 U.S. 36, 42 (1993).

This court is required to follow these precedents.  See

State Oil Co. v. Khan, 522 U.S. 3, 20 (1997) ("it is [the

Supreme Court's] prerogative alone to overrule one of its

precedents"); Agostini v. Felton, 521 U.S. 203, 237 (1997)

(courts of appeals must leave to "this Court the prerogative

of overruling its own decisions," even if such a decision

"appears to rest on reasons rejected in some other line of

decisions") (quotations, citations omitted).  Indeed, every

court of appeals recognizes that it is obliged to follow

Supreme Court precedent, even when that precedent may appear

to be undermined by subsequent Supreme Court decisions.[7] <u>See also</u> <u>United States v. Terry</u>, 240 F.3d 65 (1st Cir. 2001)( in rejecting argument that <u>Apprendi</u> effectively overruled <u>Almendarez-Torres v. United States</u>, 523 U.S. 224, (1998), the First Circuit noted that: "[defendant] Terry points out that if you count heads, the combination of the justices in the majority in <u>Apprendi</u> and in the dissent in <u>Almendarez-Torres</u> would provide a majority on the Supreme Court to overrule Almendarez- Torres. Perhaps so, but until Almendarez-Torres is overruled, we are bound by it.").

---

[7]    See, <u>e.g.</u>, <u>Figueroa v. Rivera</u>, 147 F.3d at 81 (noting that the Supreme Court has "admonished the lower federal courts to follow its directly applicable precedent, even if that precedent appears weakened by pronouncements in its subsequent decisions"); Accord, <u>Perez v. Greiner</u>, 296 F.3d 123, 125 n.4 (2d Cir. 2002); <u>Sierra v. Romaine</u>, 347 F.3d 559, 575 (3d Cir. 2003); <u>Fisher v. King</u>, 232 F.3d 391, 397 (4th Cir. 2000); <u>United States v. Rodriquez-Montelongo</u>, 263 F.3d 429, 434 (5th Cir. 2001); <u>United States v. Talley</u>, 275 F.3d 560, 565 (6th Cir. 2001); <u>Scheiber v. Dolby Laboratories, Inc.</u>, 293 F.3d 1014, 1018 (7th Cir. 2002); <u>United States v. Maynie</u>, 257 F.3d 908, 918 (8th Cir. 2001); <u>United States</u> v. Pacheco-Zepeda, 234 F.3d 411, 414 (9th Cir. 2000); <u>Conover v. Aetna US Health Care, Inc.</u>, 320 F.3d 1076, 1079 n.2 (10th Cir. 2003); <u>Florida League of Prof'l Lobbyists v. Meggs</u>, 87 F.3d 457, 462 (11th Cir. 1996); <u>U.S. Air Tour Ass'n v. F.A.A.</u>, 298 F.3d 997, 1012, n.8 (D.C. Cir. 2002).

Courts of appeals have also unanimously held that the federal Guidelines do not violate Apprendi.[8] These decisions also bind the district courts and the individual panels of the courts of appeals.[9] Thus, this court may not take it upon itself to cast aside the Guidelines system and the integrated sentencing process it mandates. See also Ruthardt v. United States, 164 F.Supp.2d 232, 245 (D.Mass. 2001)(Woodlock, J.) ("It is the prerogative of the Court of Appeals and not the District Court to overrule precedent established by an appellate panel").

---

[8]    See, e.g., United States v. Casas, 356 F.3d 104, 128 (1st Cir. 2004); United States v. Luciano, 311 F.3d 146, 153 (2d Cir. 2002); United States v. Parmelee, 319 F.3d 583, 592 (3d Cir. 2003); United States v. Cannady, 283 F.3d 641, 649 & n.7 (4th Cir. 2002); United States v. Floyd, 343 F.3d 363, 372 (5th Cir. 2003); United States v. Tarwater, 308 F.3d 494, 517 (6th Cir. 2002); United States v. Merritt, 361 F.3d 1005, 1015 (7th Cir. 2004); United States v. Banks, 340 F.3d 683, 684-65 (8th Cir. 2003); United States v. Ochao, 311 F.3d 1133, 1134-36 (9th Cir. 2002); United States v. Mendez-Zamora, 296 F.3d 1013, 1020 (10th Cir. 2002); United States v. Ortiz, 318 F.3d 1030, 1039 (11th Cir. 2003); United States v. Pettigrew, 346 F.3d 1139, 1147 n. 18 (D.C. Cir. 2003).

[9]    See United States v. Chien, 266 F.3d 1, 10 (1st Cir. 2001) (a prior panel decision shall not be disturbed absent either the occurrence of a controlling intervening event (e.g., a Supreme Court opinion on the point; a ruling of the circuit, sitting en banc; or a statutory overruling) or, in extremely rare circumstances, where non-controlling but persuasive case law suggests such a course).

**B.    The Supreme Court Has Consistently Upheld the Constitutionality of Guidelines Sentences Based on Judge-Found Facts.**

The Sentencing Reform Act of 1984 significantly altered the way in which district courts sentence persons convicted of federal crimes.  Before the Act, Congress defined broad sentencing ranges, and then left it to individual judges to set sentences within those ranges on a case-by-case basis. See Mistretta, 488 U.S. at 364 (pre-Guidelines, "Congress delegated almost unfettered discretion to the sentencing judge to determine what the sentence should be within the customarily wide range").  With the Act, Congress delegated the authority to channel that judicial discretion to the Sentencing Commission, an "independent commission in the judicial branch of the United States."  28 U.S.C. 991(a); see Mistretta, 488 U.S. at 385.  Congress charged the Commission with devising a system of sentencing ranges for categories of offenses and defendants according to various specified and unspecified factors.  See 28 U.S.C. 994(a)-(e).[10]  In response, the Commission chose to create a system

---

[10]    See also 28 U.S.C. 991(b)(1)(B) (Commission directed to establish sentencing policies that "provide certainty and fairness in meeting the purposes of sentencing" and that "avoid[] unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct" while maintaining "sufficient flexibility to permit individualized

requiring a court to consider a defendant's "real" offense (<u>i.e.</u>, his actual conduct), even if that conduct is not part of the charged offense of conviction.  <u>See</u> Guidelines Manual Ch. 1, Pt. A, intro. comment. 4(a) (2002) (now included as an editorial note following Guidelines § 1A1.1).  The Commission also specified that such guidelines determinations were to be made within the statutory maximums established by Congress in the U.S. Code.  <u>See</u> Guidelines § 5G1.1; <u>see also</u> <u>Witte</u>, 515 U.S. at 401-02 (noting that Guidelines channel the discretion of sentencing courts to take into account related uncharged misconduct in imposing sentence up to the statutory maximums, in a manner comparable to pre-Guidelines practice).

In <u>Mistretta</u>, 488 U.S. at 412, the Supreme Court upheld the constitutionality of both the federal Guidelines and the Sentencing Commission.  In the face of nondelegation and separation of powers challenges, it held that "Congress neither delegated excessive legislative power [to the Commission] nor upset the constitutionally mandated balance of powers among the coordinate Branches" by placing the Commission within the judicial branch.  <u>Id</u>. at 384-85, 412;

---

sentences").

see also id. at 412 (Constitution does not prohibit Congress "from calling upon the accumulated wisdom and experience of the Judicial Branch in creating policy on a matter uniquely within the ken of judges").[11]

With the overall constitutionality of the Guidelines established, the Court was then called upon to evaluate various of the Guidelines' real world applications. Repeatedly, it upheld Guidelines sentences based on judge-found facts neither submitted to nor considered by a jury. In Watts, 519 U.S. at 153-54, for example, the Court upheld an enhancement under U.S.S.G. § 2D1.1(b)(1) for possession of a gun in connection with a drug offense even though the jury had acquitted the defendant of a separate firearms charge under 18 U.S.C. 924(c). The Court noted that Guidelines § 1B1.3 -- the "relevant conduct" rule -- "directs sentencing courts to consider all other related conduct, whether or not it resulted in a conviction." 519

---

[11]     The courts of appeals have widely held that the Guidelines also comport with due process. See, e.g., United States v. Govan, 152 F.3d 1088, 1094 (9th Cir. 1998); United States v. Piper, 35 F.3d 611, 620 (1st Cir. 1994); United States v. Spencer, 25 F.3d 1105, 1112 (D.C. Cir. 1994); United States v. Kerr, 13 F.3d 203, 207 (7th Cir. 1993); United States v. Guajardo, 950 F.2d 203, 206 (5th Cir. 1991); United States v. Delibac, 925 F.2d 610, 614-15 (2d Cir. 1991).

U.S. at 153-54; <u>see also</u> Guidelines § 1B1.3, comment., backg'd ("conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range"). Applying that principle, the Court held that the sentencing court could consider the defendant's acquitted conduct (the firearms use) in determining his Guidelines sentencing range (for drug trafficking), so long as the acquitted conduct was proved by a preponderance of the evidence. 519 U.S. at 156-57; see <u>id</u>. at 154 ("sentencing enhancements do not punish a defendant for crimes of which he was not convicted, but rather increase his sentence because of the manner in which he committed the crime of conviction"). <u>See also</u> <u>United States v. Caba</u>, 241 F.3d 98, 101 (1st Cir. 2001), <u>cert. denied</u>, 122 S. Ct. 2317 (2002), (Court upheld the use of "acquitted conduct" for sentencing purposes after <u>Apprendi</u>).

Other cases have also upheld Guidelines sentences based on related criminal conduct proved to a judge at sentencing, and not underlying a jury's verdict of guilt. <u>See</u> <u>Witte</u>, 515 U.S. at 399-400 (judge may impose higher Guidelines sentence on defendant convicted of possessing marijuana based on judge's finding that offender also engaged in

21

uncharged cocaine conspiracy); <u>Edwards</u>, 523 U.S. at 514-15

(even if jury convicted defendant of cocaine-only

conspiracy, judge may impose higher Guidelines sentence

based on finding that defendant's conduct included crack-

related activities); <u>United States</u> v. <u>Dunnigan</u>, 507 U.S. 87,

95-96 (1993) (court may impose Guidelines enhancement for

perjury at trial when sentencing defendant for offense of

conviction).

    In so ruling, the Court clearly viewed the Guidelines

enhancements not as "statutory maximums" (requiring proof to

a jury beyond a reasonable doubt), but as rules channeling

the discretion of judges within the congressionally set

maximums in the U.S. Code.  Indeed, the Court explicitly

said as much in <u>Edwards</u>, which it notably cited with

approval in <u>Apprendi</u>:

> Of course, petitioners' statutory and constitutional
> claims [that the court must base its Guidelines
> sentence exclusively on the cocaine-only facts found by
> the jury] would make a difference if it were possible
> to argue, say, that the sentences imposed exceeded the
> maximum that the statutes permit for a cocaine-only
> conspiracy.  That is because a maximum sentence set by
> statute trumps a higher sentence set forth in the
> Guidelines.

<u>Edwards</u>, 523 U.S. at 515; <u>Apprendi</u>, 530 U.S. at 497 n.21;

<u>see also</u> <u>Witte</u>, 515 U.S. at 399-400 (although Guidelines

22

enhancement for uncharged conduct resulted in higher
Guidelines range than otherwise would have applied, range
"still falls within the scope of the legislatively
authorized penalty" and is thus constitutionally
permissible); <u>Mistretta</u>, 488 U.S. at 396 (Guidelines "do not
. . . establish[] minimum and maximum penalties" for
crimes).

The Court has thus analyzed the Guidelines as
channeling judicial discretion within congressionally set
statutory maximums, not as creating lower statutory maximums
for the offenses defined by Congress.  To upset that
understanding now -- and either invalidate the Guidelines
altogether, or hold that every of the myriad upward
adjustments, enhancements and departures in the Guidelines
must be proved to a jury beyond a reasonable doubt -- would
wreak havoc on the federal criminal justice system.  This
court should not place the system in such jeopardy and turn
back the clock on years of sentencing reform -- especially
where, as discussed below, this outcome is not mandated by
<u>Blakely</u>.[12]

_____

[12] The trend of post-<u>Blakely</u> cases plainly supports the
conclusion that the Court should defer any ruling on
<u>Blakely</u>'s application to the sentencing guidelines for a
reasonable time pending further appellate developments.  The

C.    **The Commission-promulgated Federal Guidelines Operate Differently From Washington State's Legislatively Enacted Guidelines.**

Blakely involved two Washington state statutes, one

broad and one specific, that set forth various maximum

penalties for criminal offenses.  The first prescribes

maximum sentences depending on whether a crime is a Class A

felony (life maximum), Class B (ten years), or Class C (five

years).  Wash. Rev. Code § 9A.20.021(1).  The second statute

categorizes individual crimes by "seriousness level" which,

along with an offender's criminal history score, yields a

"presumptive sentencing range," which is set forth in the

state code in the form of a sentencing grid.  See Wash. Rev.

---

debate on the role of lower courts to consider Blakely's
effect on the federal sentencing guidelines in light of
cases such as Watt and Witte is squarely set out in the
majority and dissenting opinions in Booker and will not be
repeated here.  As set forth above, however, the speed with
which Blakely issues appears headed for resolution in a
higher court has prompted some judges to defer action on
sentencings in all but a few cases where immediate
resolution is critical.  See discussion at pp. 1-5 supra.
The need to proceed only in such cases is clear because it
will avoid needless appeals (resulting in every court where
a district came down on what the Supreme Court ultimately
decides is the wrong side of the Blakely debate), disparate
treatment of otherwise similarly situated defendants ( as
this case shows, a defendant who pled guilty on June 23
could receive a vastly different sentence from one who
unsuccessfully tried to plead pled three days later), to
avoid situations in which district courts feel forced to
impose sentences that are plainly inadequate (See
discussion, below), and to avoid the public perception that
justice depends on mere happenstance.

Code § 9.94A.310(1) (Table 1) (now revised and codified at Wash. Rev. Code § 9.94A.510).  The statute authorizes a court to impose a sentence above the presumptive range if it finds "substantial and compelling reasons justifying an exceptional sentence."  <u>Blakely</u>, 2002 WL 1402697, at * 2. The statute includes an illustrative, non-exhaustive list of possible aggravating factors justifying an exceptional sentence.  2004 WL 1402697, at * 2.

Blakely pleaded guilty to second-degree kidnaping involving domestic violence and use of a firearm, a Class B felony.  The sentencing court did not sentence him to the presumptive range set by the statutory guidelines (49-53 months) for his crime, but imposed an "exceptional sentence" of 90 months based upon its finding that Blakely had acted with "deliberate cruelty" in committing the offense.  2004 WL 1402697, at * 3-4.  Applying the rule of <u>Apprendi</u> -- that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," 530 U.S. at 490 -- and relying on <u>Apprendi</u> and <u>Ring</u> v. <u>Arizona</u>, 536 U.S. 584 (2002), the Court held that "the 'statutory maximum' for <u>Apprendi</u> purposes is the maximum sentence a judge may impose solely

on the basis of the facts reflected in the jury verdict or admitted by the defendant." 2004 WL 1402697, at * 4. Because "deliberate cruelty" was neither proved to a jury nor admitted by Blakely in his plea, the Court ruled that the enhanced sentence was unconstitutional. Id. at * 4, 6.

As in Apprendi and Ring, the legislative scheme in Blakely created two distinct statutory maximums. In Blakely, one very broadly classified (and provided broad maximum ranges for) offenses as A, B, or C felonies, and the other provided crime-by-crime guidelines ranges, from which a judge could depart upward based on his or her own findings of aggravating factors. See 2004 WL 1402697, at * 2.

That is not how the federal system operates. Congress has only created one set of statutory maximums for federal crimes. The Guidelines operate within those maximums, see Guidelines § 5G1.1, and set forth a host of factors (the current Manual runs some 491 pages) that courts are to consider, both in aggravation and mitigation, in individualizing a particular sentence. These factors correspond to those that judges have always taken into account -- such as the manner in which a crime was committed, the nature of the victim, the defendant's role in

the offense, whether he obstructed justice at trial, and
whether he accepted responsibility for his actions -- in
fashioning sentences.  <u>Watts</u>, 519 U.S. at 152.[13]  As
discussed above and as the Supreme Court has indicated, the
federal Guidelines were never intended to operate on the
same footing as the statutory maximums.  Indeed, that very
assumption sits at the heart of the Guidelines: "they do not
bind or regulate the primary conduct of the public or . . .
establish[] minimum and maximum penalties for every crime.
They do no more than fetter the discretion of sentencing
judges to do what they have done for generations -- impose
sentences within the broad limits established by Congress."
<u>Mistretta</u>, 488 U.S. at 396.

        Further, as <u>Mistretta</u> made clear, the Guidelines and
the Sentencing Commission that promulgates them are
constitutionally unique.  The Commission is not a
legislative body but an "independent commission in the
judicial branch of the United States."  28 U.S.C. 991(a).

---

        [13]    Indeed, in formulating the Guidelines, the
Commission canvassed prior sentencing practice and attempted
to identify and to assign weights to all the factors that
judges traditionally used in determining appropriate
sentences.  See United States Sentencing Commission,
<u>Supplementary Report on the Initial Sentencing Guidelines
and Policy Statements</u> 16-17 (1987).

In formulating the federal Guidelines, "the Commission enjoys significant discretion." <u>Mistretta</u>, 488 U.S. at 657. The Guidelines are not statutes but sentencing rules -- binding on sentencing courts by statute, see <u>Mistretta</u>, 488 U.S. at 367; <u>Stinson</u>, 508 U.S. at 42 (citing 18 U.S.C. § 3553(b)) -- but nevertheless the unique product of a special delegation of authority.

<u>Mistretta</u> recognized that the substance of Congress' delegation to the Commission was essentially non-legislative in character. Like Congress' delegation of rulemaking authority to the judicial branch to prescribe rules of procedure and evidence, <u>see, e.g.</u>, 28 U.S.C. 2072, the delegation to the Commission to make sentencing rules "simply leaves with the Judiciary what long has belonged to it." 488 U.S. at 396. Or, put another way:

> Prior to the [Sentencing Reform] Act, the Judicial Branch, as an aggregate, decided precisely the questions assigned to the Commission: what sentence is appropriate to what criminal conduct under what circumstances. It was the everyday business of judges . . . to evaluate and weigh the various aims of sentencing and to apply those aims to the individual cases that came before them. The Sentencing Commission does no more than this, albeit basically through the methodology of sentencing guidelines, rather than entirely individualized sentencing determinations.

488 U.S. at 395; id. at 391 ("Commission's functions . . .
are clearly attendant to a central element of the
historically acknowledged mission of the Judicial Branch");
see also United States v. Kinter, 235 F.3d 192, 201 (4th Cir.
2000) ("the Commission's act of establishing sentencing
ranges in the Guidelines is categorically different from the
legislative act of setting a maximum penalty in a
substantive criminal statute").

    Blakely, of course, did not rest on the fact that the
Washington guidelines scheme was legislatively enacted.  Nor
did it say that the source of the "statutory maximum"
(whether congressional statute or commission guideline) for
Apprendi purposes is immaterial.  Imposing Apprendi's
requirements only when the legislature has made a
defendant's exposure to increased punishment contingent on
findings of fact that the legislature itself specifies
vindicates Apprendi's animating constitutional values.  The
Sixth Amendment right to trial by jury, and the due process
right to insist on rigorous proof to establish guilt of an
offense, are fully protected when there must be a jury
finding beyond a reasonable doubt on the facts that
establish the legislatively prescribed maximum punishment to
which a defendant is exposed.  Democratically-enacted

29

statutes provide one of the most basic contracts between a
citizen and his or her government.  Far more than the
intricate, extensive, and many-layered determinations in the
Guidelines manual, the U.S. Code tells the people of the
United States what is and is not expected of them, and warns
them of the ultimate consequences should they refuse to
follow the rules.

As Justice Scalia said in <u>Apprendi</u>:

> I think it not unfair to tell a prospective felon that
> if he commits his contemplated crime he is exposing
> himself to a jail sentence of 30 years –- and that if,
> upon conviction, he gets anything less than that he may
> thank the mercy of a tenderhearted judge. . . Will
> there be disparities?  Of course.  But the criminal
> will never get <u>more</u> punishment than he bargained for
> when he did the crime, and his guilt of the crime (and
> hence the length of the sentence to which he is
> exposed) will be determined beyond a reasonable doubt
> by the unanimous vote of 12 of his fellow citizens.

530 U.S. at 498 (Scalia, J., concurring) (emphasis in
original); <u>see also</u> <u>Harris</u> v. <u>United States</u>, 536 U.S. 545,
562 (2002) ("[s]ince sentencing ranges came into use,
defendants have not been able to predict from the face of
the indictment precisely what their sentence will be; the
charged facts have simply made them aware of the 'heaviest
punishment' they face if convicted.  Judges, in turn, have
always considered uncharged 'aggravating circumstances'

30

that, while increasing the defendant's punishment, have not
swelled the penalty above what the law has provided for the
acts charged.") (plurality opinion) (citations, internal
quotation marks omitted).

In sum, the Supreme Court decisions before <u>Blakely</u>
uniformly upheld the Guidelines system as written: a tightly
integrated system of sentencing rules for judges to apply
based on their findings of fact.  <u>Blakely</u> explicitly
declined to express a view on the Federal Sentencing
Guidelines.  This court accordingly should continue to
adhere to the law as it stands.

II.  **IF THE COURT HOLDS THAT <u>BLAKELY</u> DOES PRECLUDE
     APPLICATION OF THE GUIDELINES BASED ON JUDGE-MADE
     FACTUAL FINDINGS IN THIS CASE, THEN THE COURT SHOULD
     IMPOSE SENTENCE WITHIN THE STATUTORY MAXIMUM AND
     MINIMUM, WITH DUE REGARD TO THE SENTENCE PRESCRIBED BY
     THE GUIDELINES FOR SIMILAR OFFENSES AND OFFENDERS**

     A.  **Guidelines Enhancements And The Procedures For
         Applying  Them Are Not Severable From The
         Guidelines As A Whole**

     If the court disagrees with the government's position
and holds that <u>Blakely</u> applies to the Guidelines, then the
court must decide how sentencing in this case is to be
conducted.  The Guidelines contain many "enhancement"
provisions -- <u>i.e.</u>, provisions like drug weight and role in

31

this case-- that provide for a higher offense level based on particular factual findings.  If <u>Blakely</u> applies to the Guidelines, and absent a waiver by the defendant, those enhancement provisions (except for provisions based on prior convictions, <u>see</u> <u>Almendarez-Torres</u> v. <u>United States</u>, 523 U.S. 224 (1998)), generally could be applied in a given case only if, contrary to the current system of judge-made findings, the necessary facts have been found by a jury beyond a reasonable doubt.  Provisions that <u>reduce</u> a defendant's sentencing range or authorize a downward departure, however, could still be applied, as intended, by a court at sentencing based on findings by a preponderance of the evidence.  <u>Harris</u> v. <u>United States</u>, 536 U.S. 545 (2002); see also <u>Blakely</u>, 2004 WL 1402697, at * 5 (rule does not apply to cases involving "sentencing scheme[s] that imposed a statutory <u>minimum</u> if a judge found a particular fact"); <u>McMillan</u> v. <u>Pennsylvania</u>, 477 U.S. 79 (1986).[14]

A requirement that enhancing -- but not reducing -- facts have to be submitted to the jury and proven beyond a reasonable doubt would distort the operation of the

---

[14]  The application of the five-year mandatory minimum sentence required by 21 U.S.C. §841 (b)(1)(B) in this case is addressed at pages 52-58, <u>below</u>.

sentencing system in a manner that would not have been
intended by Congress or the Sentencing Commission.
Accordingly, rather than attempting to apply the Guidelines
with a _Blakely_ overlay of jury fact-finding, this court
should simply conclude that the parts of the Guidelines
system that are unconstitutional (finding of sentence-
enhancing facts by the judge) are not severable from the
Guidelines as a whole.  The result is that, in any case in
which _Blakely_ precludes judicial fact-finding under the
Guidelines, the Guidelines as a whole would be invalidated
as a binding set of rules governing sentences that must be
imposed.[15]

---

[15] _Compare_   _United States v. Croxford_, 2004 WL 1521560
(D. Utah July 7, 2004)(finding Guidelines in their entirety
unconstitutional) _and_ _United States v. Einstman_, 2004 WL
1576622,*7 (S.D.N.Y. July 17, 2004) ("Given the integrity of
the total sentencing scheme put into place by Congress,
there is simply no saving it in part to a defendant's
benefit") _with_ _United States v. Shamblin_, 2004 U.S. 1468561
(S.D. W.Va. June 30, 2004) (applying a enhancement only
system without any consideration of severability principles)
_and_ _United States v. Montgomery_, 2004 WL 1535646 (D. Utah
July 8, 2004) (same).  _See also_ _United States v. Montgomery_,
2004 WL 1562904, *3 (6th Cir. July 14, 2004) ("mandatory
system of fixed rules calibrating sentences automatically to
facts found by judges must be displaced by an indeterminate
system in which the Federal Sentencing Guidelines in fact
become 'guidelines' in the dictionary- definition sense").

### 1.  **General Severability Principles**

When a court finds some parts of a statutory scheme
unconstitutional, the court must inquire into the
severability of the remaining provisions.  All courts must
of course "refrain from invalidating more of the statute
than necessary."  Alaska Airlines, Inc. v. Brock, 480 U.S.
678, 684 (1987).  Accordingly, "[w]henever an act of
Congress contains unobjectionable provisions separable from
those found to be unconstitutional, it is the duty of th[e]
court to so declare, and to maintain the act in so far as it
is valid."  Alaska Airlines, 480 U.S. at 684.  However,
where the remaining provisions are not severable, they too
are rendered invalid by the holding of unconstitutionality.
Id.

The question whether the unconstitutional provisions of
the Federal Sentencing Guidelines are severable thus turns
on an assessment of whether Congress would have enacted the
provisions that remain constitutional absent the others.
See Minnesota v. Mille Lacs Band of Chippewa Indians, 526
U.S. 172, 191 (1999) ("The inquiry into whether a statute is
severable is essentially an inquiry into legislative
intent.").  As the Supreme Court has stated the rule,

34

"[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independent of that which is not, the invalid part may be dropped if what is left is fully operative as law." <u>Buckley v. Valeo</u>, 424 U.S. 1, 108 (1976) (quoting <u>Champlin Refining Co. v. Corporation Comm'n</u>, 286 U.S. 210, 234 (1932)); <u>INS v. Chadha</u>, 462 U.S. 919, 932, 934 (1983) (same; noting that what remains after severance of unconstitutional legislative veto is "'fully operative' and workable administrative machinery" and therefore is severable).

Under those principles, the relevant inquiry "is whether the statute will function in a <u>manner</u> consistent with the intent of Congress" after the unconstitutional provisions have been severed. <u>Alaska Airlines</u>, 480 U.S. at 685. If the statute will not function in a manner Congress intended, then the entire statute must be eliminated, and the basic policy choices in designing a new, constitutional scheme left up to Congress. The court has no authority to "rewrite [the] statute and give it an effect altogether different" from what Congress enacted. <u>Railroad Retirement Bd.</u> v. <u>Alton R. Co.</u>, 295 U.S. 330, 362 (1935).[16]

_____

[16] Nor should the Court consider the *facial* constitutionality of the guidelines in the context of this

**2.  Congress intended the Guidelines to be administered
by judges rather than juries**

When Congress enacted the Sentencing Reform Act, there
is no doubt that the system Congress had in mind was one
based on determinations by courts, not juries, of facts
necessary for sentencing.  And there is no doubt that the
Commission structured the Guidelines for use in such a
system.  Eliminating the parts of the Guidelines scheme that
would be unconstitutional if Blakely applies to the
Guidelines would leave a remainder that is not severable --
i.e., that could not operate in the manner that Congress
intended.  For that reason, in any case in which Blakely-
type procedures would have to be applied to determining
facts necessary for Guidelines enhancements, the Guidelines
as a whole would no longer be applicable as binding
authority.

_____

(or any other) guideline case.  See United States v.
Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697
(1987) (a defendant who claims that a statute is
unconstitutional on its face "must establish that no set of
circumstances exists under which the Act would be valid");
Planned Parenthood v. Casey, 505 U.S. 833, 895, 112 S.Ct.
2791, 120 L.Ed.2d 674 (1992) (statute regulating abortion
was subject to a facial constitutional challenge if "in a
large fraction of the cases in which [it] is relevant, it
will operate as a substantial obstacle to a woman's choice
to undergo an abortion.").

a.  <u>Application by judges</u>.  Congress intended the
Guidelines to be applied by judges at sentencing, not by
juries.  That is explicit in Congress's basic command to the
Sentencing Commission to promulgate a set of Guidelines.  28
U.S.C. 994(a)(1) ("The Commission . . . shall promulgate and
distribute to all courts . . . guidelines . . . <u>for use of a
sentencing court</u> in determining the sentence to be imposed
in a criminal case.") (emphasis added).  Those Guidelines to
the sentencing court shall "take . . . into account,"
insofar as relevant, "the circumstances under which the
offense was committed which mitigate or aggravate the
seriousness of the offense" and "the nature and degree of
the harm caused by the offense," 28 U.S.C. 994(c)(2) and
(3), and the defendant's "role in the offense," 28 U.S.C.
994(d)(9).  Congress accordingly specified that the
"sentencing court" -- not the jury -- shall make the factual
determinations on those factors.

The provisions for appeal similarly establish
Congress's intent that courts -- not juries -- should make
the factual determinations necessary to apply the
Guidelines.  Under 18 U.S.C. 3742(d), courts of appeals
"shall give due regard to the <u>opportunity of the district
court</u> to judge the credibility of the witnesses, and shall

37

accept <u>the findings of fact of the district court</u> unless
they are clearly erroneous and . . . shall give due
deference to the <u>district court's application of the
guidelines to the facts</u>" (emphasis added).  Moreover,
Congress provided for courts on appeal to determine "whether
the sentence . . . was imposed in violation of law" or "was
imposed as a result of an incorrect application of the
sentencing guidelines," 18 U.S.C. 3742(c); those standards
are obviously directed at sentencing courts, and the statute
makes no provision for review of jury verdicts.  Similarly,
Congress provided for equal rights of appeal for the
government and the defendant, 18 U.S.C. 3742(a) and (b),
although government appeals of jury factual findings at a
criminal trial are ordinarily impossible under the Double
Jeopardy Clause.  <u>United States</u> v. <u>Martin Linen Supply Co.</u>,
430 U.S. 564 (1977).  <u>See also</u> Comprehensive Crime Control
Act of 1983, Sen. Rep. No. 98-225, at 65 (projected
guidelines "are designed to structure <u>judicial</u> sentencing
discretion") (emphasis added); <u>id</u>. at 155 (noting importance
of appellate review, which is "crucial to the functioning of
the sentencing guidelines").[17]

---

[17] <u>See also</u> Guidelines § 1B1.2 (provision clearly
directed to courts (not juries) to "[d]etermine" facts

b.  <u>Preponderance of the evidence</u>.  Under the
Guidelines, sentencing determinations are made by judges by
a preponderance of the evidence; the reasonable-doubt
standard applicable to jury findings is entirely absent.  As
the Commission explained, "use of a preponderance of the
evidence standard is appropriate to meet due process
requirements and policy concerns in resolving disputes
regarding application of the guidelines to the facts of a
case."  Guidelines § 6A1.3 comment.  <u>See also</u> <u>United States</u>
<u>v. Watts</u>, 519 U.S. 148, 155 (1997) (per curiam) (noting "the
significance of the different standards of proof that govern
at trial and sentencing" under the Guidelines).

c.  <u>Evidence</u>.  Like any sentencing determination,
determinations on Guidelines enhancements were intended to
be made by the court based on evidence that may not be
admissible before a jury under ordinary rules of evidence.
<u>See</u> 18 U.S.C. 3661 ("No limitation shall be placed on the

_____

relevant to application of the Guidelines); Guidelines
§ 1B1.2 appl. n.2 (Guidelines manual "directs <u>the court</u>,
once it has determined the applicable guideline . . . under
§ 1B1.2(a) to determine <u>any</u> applicable specific offense
characteristics (under that guidelines) and any other
applicable sentencing factors pursuant to the relevant
conduct definition in § 1B1.3.") (emphasis added); Fed. R.
Crim. Pro. 32(i) (setting forth procedure for <u>court</u> to
resolve issues under the Guidelines at sentencing).

information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); Sentencing Guidelines § 6A1.3 (sentencing court in resolving disputed issues "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy"); Fed. R. Evid. 1101(d)(3) (Federal Rules of Evidence not applicable in sentencing proceedings).

A system under which Guidelines enhancements (but not reductions) had to be submitted to a jury for determination beyond a reasonable doubt would contravene the clear intent of Congress and the Sentencing Commission on each of the above points.  To be sure, a sentencing system that incorporated jury findings on some factual issues with judicial findings on others could be created.  But it is for Congress--not the Courts--to make that decision.  See United States v. Jackson, 390 U.S. 570, 579 (1968) (It is simply not "within the province of the courts to fashion a remedy," that would depart so dramatically from Congress's intent).  Although "[s]tatutes should be construed to avoid

constitutional questions," this "interpretative canon is not a license for the judiciary to rewrite language enacted by the legislature." United States v. Albertini, 472 U.S. 675, 680 (1985). To do so, "while purporting to be an exercise in judicial restraint, would trench upon the legislative powers vested in Congress by Art. I, § 1 of the Constitution." Ibid. As the district court recently concluded in United States v. Croxford, No. 2:02-CR-00302PGC, 2004 WL 1462111 at * 10 (D. Utah June 29, 2004) (Cassell, J,), adding a jury overlay to application of Sentencing Guidelines would "effectively require[] the courts to redraft the sentencing statutes and implementing Guidelines."

   **3.   The Sentencing guidelines were intended to be a unitary system in which uniformity and fairness would be achieved by both upward and downward adjustments**

As clear as it is that Congress never intended juries to administer the guidelines, attempting to apply the guidelines in the absence of any upward adjustments suffers from much more fundamental flaws. Because Congress intended the guideline system to work in a unitary manner in which all relevant facts--including facts that increase the seriousness of offenses and offenders--would be available to

ensure that sentences were uniform and consistent with
legislative determinations as to the appropriateness of
punishments, taking away one half the facts from judicial
consideration necessarily requires this court to conclude
that the resulting hybrid guideline scheme fails.
First, there has never been any determination by Congress,
the Sentencing Commission, or any other body that the
sentences that resulted from such a patchwork system would
be the just and appropriate sentences that satisfied the
goals of sentencing as set forth by Congress in the
Sentencing Reform Act.  It provided that "[t]he purposes of
the United States Sentencing Commission are to . . .
establish sentencing policies and practices for the Federal
criminal justice system that . . . assure the meeting of the
purposes of sentencing as set forth in section 3553(a)(2) of
title 18, United States Code", to "provide certainty and
fairness in meeting the purposes of sentencing [and]
avoiding unwarranted sentencing disparities" and to "reflect
. . . advancement in knowledge of human behavior as it
relates to the criminal justice process."  28 U.S.C. 991(b);
see 18 U.S.C. 3553(b).

   The Sentencing Commission designed the Guidelines,
including the sentencing ranges, to provide for sentences

that satisfied those goals <u>when the Guidelines were applied</u>
<u>by judges under the existing system</u>.  Neither Congress nor

the Commission has ever made any determination that the

sentences that resulted from applying enhancements (but not

reductions) only if they were first proven to a jury beyond

a reasonable doubt would be just or appropriate sentences

for the crimes at issue.  In many instances, they would

undoubtedly be too low (because some enhancements simply

could not as a practical matter be proven to a jury, because

the beyond-a-reasonable-doubt standard is too high, or for

other reasons).  In others, they could be too high (because

presumably a reviewing court could not overturn a jury

verdict on the applicability of an enhancing fact with the

same ease that it could overturn a judge's finding on that

fact).  But, either way, there is no reason to believe that

applying the Guidelines in this way would result in

sentences that the Commission (or Congress) believed were

appropriate.  <u>See</u> Sentencing Guidelines § 1B1.11 ("The

Guidelines Manual in effect on a particular date shall be

applied in its entirety.").

Among the most important goals of the Sentencing Reform

Act was "the need to avoid unwarranted sentence disparities

among defendants with similar records who have been found

43

guilty of similar conduct." 18 U.S.C. 3553(a)(6). The
Guidelines themselves embody a system under which defendants
are punished based in large measure on the real facts of the
case, not merely the offense that the prosecutor has
charged. If the Guidelines are applied with a <u>Blakely</u>
overlay requiring submission of enhancing (but not other)
facts to the jury, then those features of the system cannot
be realized. It would likely be impossible, as a practical
matter, to charge and prove to a jury beyond a reasonable
doubt <u>all</u> enhancing factors in <u>all</u> cases. The result would
be greater disparity among defendants whose criminal conduct
was in fact quite similar. Moreover, the result would be to
change the Guidelines' intended creation of a system of
reliance in part on the defendant's real offense into a
system in which the court is precluded in large part (as to
enhancing factors, at least) from relying on the defendant's
real offense and would have to rely on the charged offense
instead.

In short, the scheme that would result from trying to
superimpose the jury system on enhancements (but not
reductions) under the Guidelines would put in place a scheme
that is so different from what Congress enacted (and the
Sentencing Commission thought it was promulgating) that it

44

would in essence be judicial lawmaking, not effectuation of
congressional intent.  In those circumstances, the proper
remedy is to permit Congress to make the policy choices
necessary to put a constitutional sentencing system into
place.

**4.  <u>The guidelines system would be impractical to apply
to juries in many cases</u>**

Another substantial problem in any post-Blakely system
that operated without enhancements unless proven to a jury
beyond a reasonable doubt is that the system would be
unwieldy, incomplete, and impractical.  The practical
difficulties with a system in which enhancements (but not
reductions) could be applied only based on jury findings
beyond a reasonable doubt would be severe, and they
demonstrate that neither Congress nor the Sentencing
Commission would have enacted the resulting system or
intended that it should be applied.

a.  <u>Complexity of submitting Guidelines enhancements to
the jury</u>.  Because the factors that go into a Guidelines
sentence were intended to be applied by judges, not juries,
many are not well-suited to submission to juries.  The
result of attempting to submit them to juries could be
extraordinary complexity, followed by lengthy and extensive

appellate proceedings to determine whether the jury had been correctly instructed.

Typically, juries have to make factual determinations on the statutory elements of an offense in order to determine whether a defendant is guilty.  Those elements have usually been refined through years of judicial decisions, and the instructions given to juries have become standardized.  The sudden addition of numerous Guidelines enhancements to the list of facts that juries must decide could dramatically complicate the task of instructing juries and obtaining valid verdicts.  As Judge Cassell recently explained in Croxford, "the list of findings contemplated by the Guidelines is extensive and nuance, modified and interpreted regularly in numerous court opinions, creating a task much better suited to judges than to juries."  2004 WL 1462111, at * 10.

A simple bank robbery case, for example, could require:

a jury to determine factors regarding the nature of the offense [under Guidelines § 2B3.1] such as (1) the nature of the institution robbed; (2) the presence of, brandishing of, or other use of, a firearm; (3) the making of a death threat; (4) the presence of ordinary, serious, or permanent or life threatening bodily injury; (5) any abduction; (6) any physical restraint; (7) the taking of a firearm; (8) the taking of drugs; and (9) the value of property taken; and further factors [under Chapter 3B of the Guidelines] regarding

46

the defendant's role in the offense such as (10)
aggravating role; (11) mitigating role; (12) abuse of a
position of trust; (13) use of a special skill; and
(14) use of a minor; and further factors [under
Chapter 3A of the Guidelines] regarding the victim such
as (15) hate crime motivation; (16) vulnerable victim;
(17) official victim; (18) terroristic motivation; and
further factors concerning (19) obstruction of justice
[under § 3C1.1]; and (20) acceptance of responsibility
[under § 3E1.1] -- not to mention another dozen or so
grounds for departing upward or downward from the
general guidelines calculations.

Croxford, 2004 WL 1462111, at * 17.  The jury would have to

be instructed correctly on each of these factors, and the

jury's verdict would presumably be subject to reversal on

appeal if the instructions were incorrect.  See also United

States v. Medas, No. 03 CR 1048 (E.D.N.Y. July 1, 2004).

     b.  Difficult or impossible application of some

Guidelines provisions.  Many provisions of great importance

under the Guidelines would also have to be effectively

abandoned if enhancing factors had to be charged in an

indictment and submitted to the jury.

     (i)Obstruction of justice.  The obstruction of justice

enhancement, under Guidelines § 3C1.1, is a critical

component of the Sentencing Guidelines frequently applied

when a defendant testifies falsely at trial or when post

trial investigations by the Probation Officer that a

defendant has otherwise lied to a judicial officer.  Yet, at

47

the time of indictment for the offense, the government will
not know whether the defendant will testify falsely or
commit other obstructive acts, and it will therefore likely
be impossible to indict the defendant on the facts necessary
for this enhancement or submit the issue of obstruction to
the jury.  Therefore, <u>Blakely</u> could eliminate any practical
tool for deterring dishonesty in many criminal cases.

(ii)<u>Late-discovered factors</u>.  There are many other
enhancing facts in individual cases that the government
learns of only at or near trial or when a presentence report
is prepared.  Those facts too would apparently have to be
omitted from the sentencing calculation, because they could
not be included in the indictment and thus could likely not
be submitted to the jury.

(iii)<u>Guidelines version</u>.  Under Guidelines § 1B1.11,
"[t]he court shall use the Guidelines Manual in effect on
the date that the defendant is sentenced."  That provision
could not be put into effect if the Guidelines provision at
issue has changed between the time of jury deliberations and
the time of sentencing.  The jury would have been instructed
on the Guidelines version in effect at that time, not at the
time of sentencing.

48

(iv) <u>Relevant conduct</u>.  Another very serious problem would arise under the very complex- and very fundamental-- "relevant conduct" rules under Guidelines § 1B1.3.  As this case demonstrates, the Guidelines provide that base offense level and offense characteristics should be determined not only on the basis of the offense of conviction, but also on the basis of all of the defendant's "relevant conduct." That includes, <u>inter alia</u>,  acts undertaken by others that are "aided, abetted, counseled, commanded, induced, procured or willfully caused by the defendant" and "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."  Guidelines § 1B1.3(a)(1).  Aside from the difficulty of instructing a jury on the quite complex issues arising in applying these definitions, <u>see</u> Guidelines § 1B1.3 comment. (eight-page commentary on relevant conduct rules), requiring jury determinations on relevant conduct could take a criminal trial into areas far afield from the core question that is suitable for jury resolution -- whether the defendant committed the particular crime with which he was charged. Disputes involving severance, the admissibility of evidence, and the procedures governing such proceedings would simply be endless.

(v) <u>Upward departures</u>.  Upward departures that are not
based on specific Guidelines provisions provide another
example of hoe a post-<u>Blakely</u> system could not function as
intended.  Such departures are permissible based on "an
aggravating . . . circumstance of a kind, or to a degree,
not adequately taken into consideration by the Sentencing
Commission in formulating the guidelines that should result
in a sentence different from that described [in the
Guidelines]."  18 U.S.C. 3553(b); see Guidelines § 5K2.0.
It is difficult to see how a jury could be instructed to
make a finding about whether such a circumstance existed,
and any instruction that could be envisioned would face a
very substantial objection that it is too vague to satisfy
Due Process standards.

(vi) <u>Grouping rules</u>. Under Chapter 3D of the
Guidelines, courts are to "group" similar counts and then
sentence the defendant according to the offense level
applicable to each resulting group -- a process that may
result in a higher offense level based on the decision
whether or not to group certain counts.  <u>See</u> Guidelines
§§ 3D1.3 and 3D1.4.  But the decision whether to group
counts depends in part on very complex factual
determinations, which were clearly not designed for

50

submission to a jury.  See, e.g., Guidelines § 3D1.2(a)
(group when counts "involve the same victim and the same act
or transaction"), § 3D1.2((b) (group when counts "involve
the same victim and two or more acts or transactions
connected by a common criminal objective or constituting
part of a common scheme or plan"); Guidelines § 3D1.2
comment. (explanation of grouping rules).  In addition, the
decision whether to group counts may increase the total
offense level (and thus the total sentence).  Thus, it may
be that, if Blakely applies to the Guidelines, grouping (or
not grouping) could be applied only with appropriate jury
instructions and submission of the factual issues to the
jury.  Those instructions could be exceptionally difficult
for the court to formulate and for the jury to follow.

### 5. **The proposed Post-Blakely system would lead to absurd results**

An attempt to apply the Guidelines subject to Blakely
would also lead to absurd results in many cases, including
this one, with sentencing courts bound to impose sentences
that are far too short by any reasonable contemporary
standards.  That is not merely because sentencing decisions
generally have never been required to be made under the
beyond-a-reasonable-doubt standard and because requiring

such proof of facts that enhance -- but not those that reduce -- the defendant's sentence would inevitably skew the result.  In addition, the court in cases already tried or pled, would be required to impose an absurdly low sentence because of the structure of the Guidelines provisions themselves. See United States v. Einstman, 2004 U.S. Dist Lexis 13166 (S.D.N.Y. 2004) (McMahon) (in upholding government's Blakely severability argument, court stated that sentences imposed with no upward enhancements "make a mockery of the real("not relevant") statutory maxima that have been set by the Legislative Branch and effectively eviscerate Congress's expressed intention that, to use this case as an example, a schemer who defrauds his employer be eligible for as much as five years in prison").[18]

Under the Guidelines, convictions for cocaine trafficking result in a base offense level of 12 under Guidelines § 2D1.1(a).  That translates into a sentencing range of 10-16 months' imprisonment.  The enhancements for larger amounts of drugs under Section 2D1.1(b)(1), however, can add up to 26 levels to the defendant's offense level,

---

[18]    As set forth above, even Judge Goodwin, the author of the Shamblin decision, has continued all sentencings until October rather than sentence defendants in the many which Rodriguez suggests here.

and many other enhancements under Section 2B1.1 may further
increase a drug dealer's sentence.  Most of those
enhancements, however, would not ordinarily have been
charged in the indictment or found by the jury, and they
accordingly would be unavailable at sentencing if the
Guidelines were applied with the Blakely overlay requiring a
jury verdict on enhancing factors.  Accordingly, many
defendants who traffic drugs -- even large amounts of
cocaine using firearms and extensive drug trafficking
organizations with all the devastating consequences they
have had for communities like Lawrence, Massachusetts, --
would likely be limited to little jail time (at least in the
short term) if the Guidelines could only be applied only
with Blakely-type procedures for enhancing factors.  See
also United States v. Shamblin, Cr. No. 2:03-00217, 2004 WL
1468561, at * 10 (S.D.W.Va. June 30, 2004) (reduction in
drug case from 240 months' imprisonment to "almost certainly
inadequate" 12-month sentence under Blakely).

     Such results demonstrate that the Guidelines would not
"function in a manner consistent with the intent of
Congress" if a court attempted to apply them with the
Blakely overlay.  Alaska Airlines, 480 U.S. at 685.
Accordingly, if Blakely applies to the Guidelines in this

case, the provisions of the current sentencing system that
would be unconstitutional are not severable from the
remainder of the Guidelines.

    **B.   The Statutory Mandatory Minimum Applies in this
case if the Court finds that Rodriguez is
responsible for at least 500 grams of cocaine**

    Even if this Court concludes that <u>Blakely</u> applies to
the sentencing guidelines, this is also not only a
guidelines case.  As the PSR in this case makes clear,
Rodriguez's sentence is not merely driven by the guidelines,
but also by whether or not he is responsible for at least
500 grams of cocaine.  <u>See</u> 21 U.S.C. §841(b)(1)(B).  Because
a statutory mandatory minimum that is unaffected by <u>Blakely</u>
applies in this case, the Court must make a traditional <u>pre-
Blakely</u> determination of that issue in this case.

    By its terms, <u>Blakely</u> did not overrule <u>McMillan v.
Pennsylvania</u>, 477 U.S. 79 (1986) or <u>Harris v. United States</u>,
536 U.S. 545 (2002).  2004 WL 1402697, at *5.  In <u>Harris</u>,
the Court reaffirmed the holding of <u>McMillan v.
Pennsylvania</u>, that a fact that increases a statutory <u>minimum</u>
sentence within the authorized range may be found by the
sentencing judge by a preponderance of the evidence, and
limited the <u>Apprendi</u> rule to facts that increase a statutory

54

maximum.  536 U.S. at 568-569; id. at 556-568 (opinion of

Kennedy, J.); id. at 569-572 (opinion of Breyer, J.); see

also Blakely, 2004 WL 1402697, at *5 (distinguishing

McMillan).  Pre-Blakely law in this Circuit concerning the

application of Harris to sentences under Title 21 will thus

continue to apply.  See United States v. Goodine, 326 F.3d

26, 29-31 (1st Cir. 2003) (" a judge's determination of drug

quantity can influence the mandatory minimum sentence

imposed, and such incremental changes in the minimum are

typical sentencing provisions determined by the judge").

Compare United States v. Luciano, 311 F.3d 146, 154 (2d Cir.

2002) (claim that the imposition of a mandatory minimum

sentence under 21 U.S.C. 841(b) without a jury finding

violates Apprendi "is not tenable after Harris") with United

States v. Velasco-Heredia, 319 F.3d 1080, 1085 (9th Cir.

2003) (Harris does not apply to imposition of mandatory

minimum sentence under 21 U.S.C. 841(b) because, unlike 18

U.S.C. 924(c), finding which increases mandatory minimum

sentence under Section 841(b) also exposes defendant to

higher statutory maximum).

     The only post-Blakely case specifically dealing with

mandatory minimums, Spero v. United States, 2004 WL 1516863

(11th Cir. July 8, 2004) (per curiam), supports this

position.  Spero was convicted of heroin trafficking under
21 U.S.C. §841.  At sentencing, the Court made a judicial
finding by a preponderance of the evidence that Spero's
distribution had resulted in the death of a heroin user and
imposed the 20-year mandatory minimum required by 21 U.S.C.
§841(b)(1)(C).  On a subsequent section 2255 motion,
however, the district court concluded that <u>Apprendi</u> required
the government to prove the overdose at trial and reduced
the sentence to 60 months (the otherwise applicable
guideline sentence without considering the overdose death).
The government appealed that decision to the Eleventh
Circuit.

   In a decision which confirms one of the fundamental
limitations recognized by Justice Scalia's opinion for the
Court in <u>Blakely</u>, the Court of Appeals reversed.  It held
that, because the 20 year mandatory minimum sentence
originally imposed by the district court did not exceed the
otherwise applicable statutory maximum, there was no
<u>Apprendi</u> error.  This is of course the law in this circuit
as well. <u>E.g.</u>, <u>United States v. Eirby</u>, 262 F.3d 31, 37 (1st
Cir.2001) (<u>Apprendi</u> does not effect the application of a
mandatory minimum sentence in drug cases where the resulting
sentence was less than 240 months; court noted that

Apprendi taken pains to preserve the authority of McMillan
v. Pennsylvania, 477 U.S. 79, 81-84, 106 S.Ct. 2411, 91
L.Ed.2d 67 (1986) which upheld a state statute that required
a mandatory minimum sentence based solely on a judge's
preponderance-of-the-evidence findings and concluded that
the mere imposition of a mandatory minimum did not by itself
implicate the due process issues raised by Apprendi); United
States v. Robinson, 241 F.3d 115, 123 (1st Cir. 2001)("since
McMillan clearly allows a fact that triggers a mandatory
minimum sentence to be found by a judge using a
preponderance-of-the-evidence standard as long as the
mandatory minimum does not exceed the otherwise applicable
statutory maximum, it forecloses [any argument that such
mandatory minimums violate Apprendi]"). See also  United
States v. Harris, 122 S.Ct 2406 (2002)(mandatory sentences
contained in 18 U.S.C. s 924 (c) remain sentencing factors
so long as the sentence fall within the statutory maximum).
But see United States v. Martinez, 234 F.Supp 2d 80, 90 (D.
Mass. 2002) (Gertner, J.)(Apprendi required government to
prove overdose at trial to subject defendant to 20 year
mandatory minimum sentence).

Because it was decided on July 17, Spero of course also
had to address the implications of Blakely.  It did, fully

supporting the conclusion that the application of the
mandatory minimum in this case remains a sentencing factor
for the Court.  This is what the Eleventh Circuit Court of
Appeals held:

> Whatever other effect the Supreme Court's recent
> decision in <u>Blakely v. Washington</u> may have, it does not
> undermine the validity of minimum mandatory sentences, at
> least not where the enhanced minimum does not exceed the
> non-enhanced maximum. That much is clear from the fact that
> <u>Blakely</u>, like <u>Apprendi</u>, explicitly distinguished minimum
> mandatory sentences from the circumstances involved in those
> cases and indicated that <u>McMillan v. Pennsylvania</u>, 477 U.S.
> 79, 106 S.Ct. 2411 (1986), is still good law.
>
>      . . . . . . . . . . . . . . .
>
> This case is on all fours with <u>McMillan</u>. The statutory
> maximum for the defendants' crime of conviction, under the
> facts to which they pleaded guilty and without reference to
> the "death enhancement" found by the judge, was twenty
> years. Therefore, the twenty-year sentence imposed upon the
> defendants did not exceed the statutory maximum and violate
> the <u>Apprendi /Blakely</u> doctrine.
>
>
> The district court thought otherwise. It reasoned that
> <u>Apprendi</u> should apply because the court might have sentenced
> the defendants to less than twenty years had there not been
> the twenty-year minimum, which resulted from the judicial
> finding that death had resulted from the drug offense to
> which the defendants pleaded guilty. However, statutory
> sentencing factors that trigger a statutory minimum and
> limit the judge's discretion in imposing sentence are
> permissible and need not be found by a jury, "provided that
> the mandatory minimum term does not exceed the otherwise
> applicable statutory maximum." <u>Sanchez</u>, 269 F.3d at 1269;
> <u>see also Harris v. United States</u>, 536 U.S. 545, 567, 122
> S.Ct. 2406, 2419 (2002) ("Within the range authorized by the
> jury's verdict, however, the political system may channel
> judicial discretion ... by requiring defendants to serve
> minimum terms after judges make certain factual findings.")
> That is what <u>McMillan</u> is all about.

(Emphasis supplied).  The government believes that _Spero_ is also what *this case* is all about at least in so far as it deals with setting the floor for Rodriguez' sentence. Because _Spero_ demonstrates that _Blakely_ does not affect the applicability of a statutory mandatory minimum sentence if the Court makes a finding that Rodriguez is responsible for 500 grams of cocaine, the Court should set the matter down for a sentencing hearing at which the Court can determine whether this statutory standard has been satisfied by a preponderance of the evidence.

      **C.**    **Where The Guidelines Cannot Constitutionally Govern The Court's Sentencing Decision, The Sentencing Court Must Nonetheless Give Due Regard To The Otherwise Applicable Guidelines Sentence**

In cases in which the court determines that the defendant's Guidelines sentence turns on enhancements that have not been found by the jury, the Guidelines could not constitutionally be applied as mandatory rules of law governing the sentence.  In such cases, the court should sentence the defendant between the minimum and maximum sentences prescribed by statute, and it may find whatever facts it believes necessary to impose a sentence within that range.  The Court in _Blakely_ noted that indeterminate sentencing schemes, in which the judge "may implicitly rule

on those facts he deems important to the exercise of his
sentencing discretion," remain fully constitutional.  2004
WL 1402697, at * 7.  Accordingly, the court would be free to
make (by a preponderance of the evidence) whatever factual
determinations are necessary in imposing sentence in a case
in which the Guidelines could not constitutionally govern
the sentence.

Even in such cases, however, the court would not be
free simply to ignore the Guidelines.  Under 18 U.S.C.
3553(b):

> [i]n the absence of an applicable sentencing guideline
> in the case of an offense other than a petty offense,
> the court shall . . . have due regard for the
> relationship of the sentence imposed to sentences
> prescribed by guidelines applicable to similar offenses
> and offenders, and to the policy statements of the
> Sentencing Commission.

Congress accordingly recognized that there would be cases in
which the Guidelines would not be directly applicable. In
all such cases, Congress directed that the court should give
"due regard" to the applicable Guidelines provisions and
policy statements.  The constitutionality of that provision
is not called into question by <u>Blakely</u>, and there is every
reason to believe that Congress would have intended that it
remain applicable even in cases in which the Guidelines

60

themselves cannot directly govern the sentence.
Accordingly, even in cases in which the Guidelines cannot
constitutionally govern the sentence, the sentencing court
should consider the sentencing range applicable under the
most analogous Guidelines provisions and give that range
"due regard" in imposing sentence.

Similarly, the statutes providing for appellate review
of sentences would continue to govern, even in cases in
which the Guidelines themselves cannot constitutionally
govern the sentence.  The government, for example, could
still appeal on the ground that the sentence "was imposed
for an offense for which there is no sentencing guideline
and is plainly unreasonable," 18 U.S.C. 3742(b), and the
court of appeals should reverse the sentence if it finds
that the sentence was so imposed, 18 U.S.C. 3742(f)(2).  It
is "plainly unreasonable" for a district court to fail to
give "due regard" to the Guidelines, as required by Section
3553(b).  Accordingly, a court of appeals' determination of
whether the sentence should be reversed under Section
3742(f)(2) should place significant weight on whether such
regard was given.

Finally, even aside from those statutory commands, "[t]he Sentencing Commission has carefully developed the Guidelines over many years, and the Guidelines generally produce sentences that accord with the public's view of just punishment." Croxford, 2004 WL 1462111, at * 13. Accordingly, the Guidelines provide "useful instruction on the appropriate sentence," ibid., and sentencing courts should take them into careful consideration in imposing sentence even in cases in which, due to Blakely, the Guidelines could not be applied as binding authority that governs the sentence.

## CONCLUSION

As this memorandum is being filed, the issues it raises are playing out in every federal court in this nation. Sooner or later--and by all accounts it will be sooner--they will also be addressed by the United States Supreme Court.

As tempting as it is to want to address these issues now, the manner in which our federal system works simply demonstrates that restraint should be the order of the day. As more district courts prematurely jump into the Blakely fray, they will create more decisions that will have to be revisited once the Supreme Court has spoken. While many of

the decisions that have been issued to date have surely
helped to refine and focus issues, there is only so much of
the preliminaries that make sense.  Hence, unless this case
truly creates a unique issue under <u>Blakely</u>, the government
believes that justice would be better served by waiting and
making sure that we all get it right the first time.

If the Court decides to pursue these issues now, then
it should reject Rodriguez' invitation to wreak havoc on the
federal system of criminal justice by indiscriminately
extending <u>Blakely</u>.  There are differences between the
Washington state system in <u>Blakely</u> and practice under the
Federal Sentencing Guidelines that, for all the reasons set
forth above, simply counsel caution.

Any determination by the court that <u>Blakely</u> applies to
the Federal Sentencing Guidelines necessarily means that the
guidelines are invalid in their entirety as they apply to
this case. In their stead, the government requests that the
Court impose a sentence on Carmelo Rodriguez within the
applicable 60-240 month range that it considers to be just
after taking due regard for the 92-112 month range the

United States Probation Office concluded to be correct. It is correct, and reflects a sentence that is commensurate with the misery Carmelo Rodriguez and his Latin King compatriots inflicted on the people of Lawrence and Lowell, Massachusetts.

                              Respectfully submitted,

                              MICHAEL J. SULLIVAN
                              United States Attorney

                         By:
                              /s John A. Wortmann, Jr.
Dated: July 1, 2004           JOHN WORTMANN, JR.
                              Assistant U.S. Attorney
                              617-748-3207