UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------------------x
UNITED STATES OF AMERICA         :
                                 :
    vs.                          :   Crim. No. 04-10048-NG
                                 :
CARMELO RODRIGUEZ,               :
                                 :
    Defendant.                   :
------------------------------------------------x

## DEFENDANT CARMELO RODRIGUEZ'S
## AMENDED SENTENCING MEMORANDUM

Defendant Carmelo Rodriguez ("Rodriguez") submits this amended sentencing memorandum to aid the court at Rodriguez's sentencing hearing, scheduled for October 21, 2004. Rodriguez respectfully requests, based on the facts and arguments presented below, that the Court sentence him to a period of incarceration of no more than 27 months' imprisonment, along with a recommendation that the Bureau of Prisons assign him to an intensive incarceration program.

1. **Background**

On April 8, 2004, Rodriguez entered a plea of guilty to pending substantive counts in which he is charged with participating in particular drug transactions, as well as to a conspiracy count in support of which he has admitted providing favors to at least one other co-defendant engaged in a similar transaction. At the time of the offense, Rodriguez was 20 years of age. Attached hereto as Exhibit A is a report of Dr. Paul Spiers, a psychologist who concludes that a significantly reduced mental capacity substantially contributed to the commission of the offense. Exh. A at 9. Dr. Spiers also concludes that Rodriguez can be rehabilitated, which would be accomplished most effectively through "appropriate structure, proper social modeling, consistent

discipline and the opportunity to improve his academic and reasoning skills." *Id.* at 10.

The conclusions of Dr. Spiers are supported by objective testing and subjective interviews. His report sets forth the context of Rodriguez's dysfunctional upbringing that led to his recruitment into the so-called Latin Kings at the age of 15. *Id.* at 5-6. According to Dr. Spiers, the cognitive testing of Rodriguez shows that "his mental age at that time could not have been any more than that of a pre-adolescent, with verbal intellectual skills equivalent to a nine year old." *Id.* at 6. Rodriguez grew up in a highly unstable environment, moving frequently and without a father figure. *Id.* at 5-6. His mother is in the final stages of terminal cancer.

As a result of the investigation, the government seized approximately 158.5 grams of cocaine from Rodriguez and his co-defendants. The government's key cooperating witness has claimed that Rodriguez flushed 3 ounces (approximately 84 grams) of cocaine during a police search several weeks before the conclusion of the investigation. (The government seized approximately 53.5 grams (of the 158.5 seized grams of cocaine) after the date of the purported flush, which poses a potential issue of double counting under the government's analysis.)

In an effort to elevate the quantity beyond what the investigation actually revealed, the government attempts to rely on unreliable boasting by Rodriguez and others. As Dr. Spiers has explained, "[s]uch behaviors by the defendant as boasting about himself or exaggerating his accomplishments, even if criminal, would serve to ensure such distance" from close relationships while seeking artificially to elevate his "stature to help allay his anxiety, poor self-image or distrust." *Id.* at 7. At any rate, as discussed in Points 2-4, *infra*, *Blakely v. Washington*, 124 S. Ct. 2531 (2004), precludes any such upward adjustment at this stage of the proceedings.

To seek an upward adjustment for Rodriguez's role in the offense, the government relies

extensively on an unidentified cooperating witness as to whom *Giglio* material has not yet even been fully disclosed. The government simply lacks reliable evidence from which to conclude that such an adjustment is warranted. At any rate, as discussed in Points 2-4, *infra*, *Blakely* precludes any such upward adjustment at this stage.

The government also has provided the United States Probation Office with significant innuendo regarding efforts to obtain firearms from Rodriguez and his codefendants, as well as various remarks regarding entirely unproven acts of violence. In reality, the government is fully aware that, notwithstanding arduous efforts by its investigators for more than a year, Rodriguez neither produced a firearm nor otherwise arranged for an actual sale of one. Whatever the flaws, even pre-*Blakely*, the United States Sentencing Guidelines ("USSG" or the "Guidelines") never permitted upward adjustments based on speculation and innuendo.

As explained by the United States Probation Office in the PSR, Rodriguez has never previously served any term of imprisonment other than pretrial detention. His criminal history is relatively minor, primarily the result of juvenile offenses, but for the compact time in which a few offenses occurred. This matter has served as a wake-up call for Rodriguez. Assignment to an intensive confinement program could serve the best role in the rehabilitation process.

2. ***Blakely* Prohibition Against Turning Sentencings Into The Functional Equivalent of Convictions for Greater Offenses.**

The decision in *Blakely v. Washington*, 124 S. Ct. 2531 (2004), prohibits the government's efforts to achieve the functional equivalent of a conviction at sentencing of a crime under 21 U.S.C. §841(b)(1)(B), when the facts admitted to at the underlying plea of guilty support only a conviction of a lesser-included offense under §841(b)(1)(C), and the greater

offense had not even been charged in the indictment. In *Blakely*, the United States Supreme Court revisited the tension between every defendant's Sixth Amendment right to a jury trial on all essential elements of an offense, and the application of sentencing enhancements under statutory schemes and sentencing guidelines. Previously, in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that, under the Sixth Amendment, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490.

In striking down a sentence that functionally equated to a conviction at sentencing of a greater offense than that to which the defendant had pleaded guilty, the *Blakely* Court unequivocally rejected the existence of any meaningful distinction between mere acceptable sentencing factors and problematic enhancements that cross the line only when they serve as a "tail that wags the dog of the substantive offense." *Blakely*, 124 S. Ct. at 2539. The majority in *Blakely* explained that "[t]he subjectivity of this [tail wagging] standard is obvious" because "[w]ith *too far* as the yardstick, it is always possible to disagree with such judgments and never to refute them. *Id.* at 1239-40 (emphasis in original). By so doing, the *Blakely* Court confirmed that *Apprendi* meant just what it said, namely, if a particular fact increases the potential maximum penalty, then it must be charged in the accusation, *id.* at 2536, and proven beyond a reasonable doubt to a jury, *id.* at 2540 ("the very reason the Framers put a jury-trial guarantee in the Constitution is that they were unwilling to trust government to mark out the role of the jury").

Here, the government attempts, in direct violation of *Apprendi*, *Blakely* and the Sixth Amendment to the United States Constitution, to elevate a conviction under 21 U.S.C. §841(b)(1)(C), to a conviction of a greater offense under §841(b)(1)(B), without charging facts in

the indictment to support the enhancement under §841(b)(1)(B), and without a jury making requisite findings of fact, beyond a reasonable doubt, regarding the essential element of drug quantity that supports a conviction of the greater offense. The government's effort to elevate the offense of conviction at sentencing triggers a greater increase in maximum penalties than were found constitutionally infirm in *Jones v. United States*, 526 U.S. 227 (1999). The *Jones* Court found a staggered definition of criminal carjacking prohibitions to constitute greater and lesser-included offenses as to which the government must charge and prove to a jury beyond a reasonable doubt *all distinct elements*. *See id.* at 251-52 (1999) (explaining that the maximum penalty increased by two thirds based on one distinct element, and construing carjacking statute in 18 U.S.C. §2119 "as establishing three separate offenses by the specification of distinct elements, each of which must be charged by indictment, proven beyond a reasonable doubt, and submitted to a jury for its verdict"). The government has attempted to avoid *Jones* by its (misplaced) reliance on *Harris v. United States*, 536 U.S. 545 (2002), which actually involved findings of fact at sentencing that triggered only the imposition of a mandatory minimum, not any increase in the potential maximum penalty.

The statutory scheme at issue in the present matter is much more like that in *Jones* than like that in *Harris*. In particular, 21 U.S.C. § 841(b) sets forth three distinct offenses based on drug quantities, with different penalty ranges for each. As in *Jones*, and unlike in *Harris*, the statutory *maximum* under §841(b) changes with each greater offense defined therein. Without a particular quantity of drug set forth in an indictment, the penalty range is 0-20 years' imprisonment, *see* 21 U.S.C. § 841(b)(1)(C), for more than 500 grams of cocaine the penalty increases to 5-40 years, *see* § 841(b)(1)(B), and, for more than 5 kilograms the penalty increases

to 10-life in prison, *see* § 841(b)(1)(A). Unlike the modest change in a mandatory minimum and the *stable* maximum penalty at issue in *Harris*, 536 U.S. at 554 (involving modest increases of only minimums in ranges that varied from 5-life, to 7-life, to 10-life), the statutory offenses at issue under §841(b) involve "steeply higher penalties" for each of the greater offenses, including geometric increases in statutory maximums. There is simply no viable authority, after *Blakely*, for the government to ignore the increases of the maximum penalty for each of the greater offenses set forth in §841(b), while pretending that the legislature had merely increased minimums for each of the separate offenses as in *Harris*.

Before *Blakely*, lower courts split on the issue of whether drug quantity under §841(b) constituted an element of the offense or a mere sentencing factor that the legislature did not intend as a "tail that wags the dog of the substantive offense." *Compare United States v. Buckland*, 289 F.3d 558, 568 (9th Cir. 2002) (*en banc*) ("We honor the intent of Congress and the requirements of due process by treating drug quantity and type, which fix the maximum sentence for a conviction, as we would any other material fact in a criminal prosecution: it must be charged in the indictment, submitted to the jury, subject to the rules of evidence, and proved beyond a reasonable doubt."); *United States v. Doggett*, 230 F.3d 160, 164-65 (5th Cir. 2000) ("If the government seeks enhanced penalties under 21 U.S.C. §841(b)(1)(A) or (B), the [drug] quantity must be stated in the indictment and submitted to a jury for a finding of proof beyond a reasonable doubt"), *with United States v. Goodine*, 326 F.3d 26, 32 (1st Cir. 2003) (departing from *Apprendi* in facial analysis that now clearly transgresses *Blakely*: "Permitting the judge to make a determination as to drug quantity is not permitting the tail of sentencing to wag the dog of the substantive offense.").

6

The *Blakely* decision has proven *Buckland, Doggett* and their progeny correct, while explaining that the "tail wagging" sort of approaches in *Goodine*-type decisions must fall as contrary to the Sixth Amendment. *See Blakely*, 124 S. Ct. at 2539-40 (explaining that "[t]he subjectivity of this [tail wagging] standard is obvious" because "[w]ith *too far* as the yardstick, it is always possible to disagree with such judgments and never to refute them"); *see United States v. Martinez*, 268 F. Supp. 2d 70, 72-74 (D. Mass. 2003) (Gertner, J.) (describing the "tension" between *Goodine* and *Apprendi*, and finding even pre-*Blakely* that certain "facts that drive penalties in §841(b)" must be charged and proven beyond a reasonable doubt).

Accordingly, *Blakely* confirms that the Sixth Amendment prohibits the government from turning convictions under §841(b)(1)(C) into convictions of greater offenses at sentencing under §841(b)(1)(B) because an essential element of the greater offense, the requisite drug quantity, was neither charged, nor submitted to a jury, nor admitted to by the defendant at his change-of-plea colloquy.

3. **Striking Down A *Blakely*-ized Guideline Maximum Would Violate The *Ex Post Facto* and Due Process Clauses.**

Under the *Ex Post Facto* Clause of the Constitution, it is axiomatic that potential penalties for a criminal defendant cannot be increased retroactively after the commission of the offense. *See Miller v. Florida*, 482 U.S. 423, 435 (1987) (unanimous decision). The *Miller* Court held that an *ex post facto* violation occurred even when state sentencing guidelines merely limited sentencing discretion retroactively by creating a high hurdle to justify departures from a guideline range. *Id.*; *see Johnson v. United States*, 529 U.S. 694, 696 (2000) (construing portion of Sentencing Reform Act in manner that avoided consideration of *Ex Post Facto* Clause).

7

In the First Circuit, the *Ex Post Facto* Clause has been limited to criminal proceedings. *See United States v. Bodre*, 948 F.2d 28, 31-32 (1st Cir. 1991) (explaining that there is no application to deportation proceedings). The *ex post facto* "inquiry is on whether a change in the law is more onerous than preexisting law." *Id.* at 34 n. 6. "In making this determination, the focus is on 'the practical operation' of the change in the law rather than whether the new law is 'technically an increase in the punishment annexed to the crime.'" *Id.*.

Likewise, the Due Process Clause protects a defendant from "an unforeseeable and retroactive judicial expansion of narrow and precise statutory language" in a criminal statute. *Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964). In *Bouie*, the Court held that a retroactive application of a new construction of a statute violated due process: "If a . . . legislature is barred by the *Ex Post Facto* Clause from passing such a law, it must follow that a ... [c]ourt is barred by the Due Process Clause from achieving precisely the same result by judicial construction." *Id.*, 378 U.S. at 353-54; *see BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 n. 22 (1996) ("Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also the severity of the penalty that a State may impose.") (citing *Miller v. Florida*, 482 U.S. 423 (1987); *Bouie*, 378 U.S. at 350-55). When viewed against the "law which had been expressed prior," *see Bouie*, 378 U.S. at 354, the evisceration of the guideline maximum sentence – the constitutional component of which has been recognized by *Blakely* – would constitute the retroactive application of an "unforeseeable judicial enlargement of a criminal statute," *see Bouie*, 378 U.S. at 353, because courts have repeatedly recognized defendants' entitlement to the protection of a guideline maximum.

After the acceptance of his plea of guilty, Rodriguez held a vested "legal right" under *Apprendi*, *Jones* and *Blakely* to a guideline maximum that applies based solely on the facts admitted in connection with his guilty plea to the specific offenses of conviction. *See Blakely*, 124 S. Ct. at 2539-40. As a matter of fundamental fairness to criminal defendants, the *Ex Post Facto* and Due Process Clauses must preclude the retroactive elimination of Rodriguez's "legal right to a lesser sentence" at or below a *Blakely*-ized guidelines maximum.

The government has suggested that by stacking the penalty for each count of conviction, even *Blakely*-ized guidelines maximums for each count can establish a maximum penalty in total that exceeds 60 months, thereby purportedly permitting the potential application of a mandatory minimum of 5 years. In so arguing, the government ignores not only the argument set forth in Point 2, *supra*, but also the fact that, on each of the counts of conviction, the *Blakely*-ized guideline maximum would be computed without any enhancement whatsoever. There is simply not a single count of conviction in this matter as to which a mandatory minimum of 5 years could apply without exceeding the *Blakely*-ized guidelines maximum for that particular count.

Hence, the Due Process Clause requires the avoidance of judicially driven *ex post facto*-type problems that would belatedly and retroactively deprive Rodriguez of his legal right to a sentence below a *Blakely*-ized guideline maximum.

4. **The Rule Of Lenity Entitles Rodriguez To The Benefit Of Any Ambiguities In The Application Of *Blakely* At His Sentencing.**

"The rule of lenity states that a court cannot interpret a federal criminal statute 'so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended.'" *United States v. R.L.C.*, 915 F.2d 320, 325

(8th Cir. 1990) (quoting *Ladner v. United States*, 358 U.S. 169, 178 (1958)), *aff'd*, 503 U.S. 291 (1992). The rule of lenity "applies to sentencing provisions as well as to substantive criminal statutes." *R.L.C.*, 915 F.2d at 325 (citing to *Bifulco v. United States*, 447 U.S. 381, 387 (1980)). "The rule of lenity favors the statutory construction that yields the shorter sentence." *R.L.C.*, 915 F.2d at 325 (curing ambiguity by limiting criminal penalties faced by minors); *see United States v. Diaz*, 989 F.2d 391, 393 (10th Cir. 1993) (applying rule of lenity because "[a] sentence of imprisonment amounting to twice the amount of time permissible under the maximum sentence at the time the offense was committed is harsh" and "not clearly mandate[d]"). In conjunction with the constitutional rights discussed above, and previous arguments to this Court under *Blakely*, the rule of lenity requires that any ambiguities regarding Rodriguez's sentence must be construed in his favor, thereby entitling him to a guidelines maximum computed consistent with *Blakely*, without any enhancements based solely on judicial factfinding.

Under the appropriate application of the guidelines under *Blakely*, combined with the rule of lenity, the government neither charged nor proved to a jury any facts that would support any enhancements in this matter. Rodriguez is entitled to a sentence below a *Blakely*-ized guideline maximum.

### 5.  Rodriguez's Total Offense Level Should Be No More Than 15.

As described above, under *Blakely*, the government cannot proceed at sentencing to establish enhancements based on facts beyond the admissions by Rodriguez at the change of plea colloquy. Establishing a particular quantity of drugs for sentencing requires a particularized showing of a reasonably foreseeable amount from a defendant's vantage point. *United States v. Miranda-Santiago*, 96 F.3d 517, 524 (1st Cir. 1996) (Gertner, J.). An upward adjustment for

supervisory role also requires specific evidence demonstrating he "exercised control over [other] persons or was otherwise responsible for organizing them in the commission of the offense." *United States v. Frankhauser*, 80 F.3d 641, 654 (1st Cir. 1996) (reversing imposition of upward role adjustment based on insufficient findings). By choosing not to enter into a plea agreement with fair and acceptable stipulations on these issues, and by not seeking specific admissions from Rodriguez at the change of plea colloquy, the government has foreclosed its ability to seek these upward adjustments at sentencing.

There is no specific quantity of drugs for which Rodriguez has been convicted, thereby suggesting that a base offense level of no more than 12 should apply, under USSG § 2D1.1, Drug Quantity Table ¶ 14 (before a reduction for acceptance of responsibility), because *Blakely* prohibits the government from proving facts at sentencing that support an enhancement to which the defendant has not admitted (discussed *supra* Points 2-4). Even taking into consideration the actual amount of drugs seized by the government in the underlying investigation, pursuant to USSG § 2D1.1, Drug Quantity Table ¶ 11, a base offense level of no more than 18 could apply to Rodriguez. Under §3E1.1(a), Rodriguez is entitled to a decrease in the offense level by 3 levels based on his acceptance of responsibility, resulting in a total offense level of at most 15.

The government is barred under *Blakely* from seeking any further enhancement for either quantity or a supervisory role in the offense. At any rate, an evidentiary hearing will confirm that Rodriguez did not play a supervisory role. Accordingly, the total offense level for Rodriguez is at most 15.

11

6.  **Criminal History Category**

The amended PSR significantly overstates the appropriate criminal history category for Rodriguez at IV. The underlying criminal history score includes in substantial part minor juvenile offenses. Also, the PSR adds 2 points to Rodriguez's criminal history score based on an uncharged transaction that occurred on February 7, 2004, days after probation had been ordered on an unrelated state conviction. As reflected in the PSR, Rodriguez did not even yet meet with his probation officer to commence the probation process. The PSR also adds points because of the timing of the present offense in relation to past offenses, including one in which the charges had actually been dismissed before he entered an apparent plea in exchange for time served awaiting a trial.

Rodriguez has objected to the calculation of a category IV based on these flaws in the PSR. Either because of errors of law, or the significant overstatement of Rodriguez's criminal history category, the proper category under which Rodriguez should be sentenced should be II. *See United States v. Mejia*, 278 F. Supp. 2d 55, 62-63 (D. Mass. 2003) (Gertner, J.) (finding downward departure appropriate because "had all constitutional processes been working, as they were supposed to—his criminal history score should have been reduced by four points, earning him a criminal history II rather than criminal history III range"); *United States v. Trask*, 143 F. Supp. 2d 88, 93 (D. Mass 2001) (Gertner, J.) (departing one level in criminal history category where there were no prior convictions for violent crimes and several past offenses simply arose from "a problem which had never been seriously addressed"); *United States v. Lacy*, 99 F. Supp. 2d 108, 122-23 (D. Mass. 2000) (decreasing criminal history category where the prior "record is largely non-violent"); *United States v. Leviner*, 31 F. Supp. 2d 23, 31-34 (D. Mass. 1998)

12

(departed downward from criminal history category based an overstated culpability and likelihood of recidivism where primarily motor vehicle violations and minor drug possession offenses).

### 7. The Court Should Grant Rodriguez A Downward Departure Because A Significantly Reduced Mental Capacity Substantially Contributed to the Commission of the Offense

Under the Guidelines, factors that might constitute grounds for a downward departure are divided into three categories: (1) prohibited factors, which can never be relied upon as the basis for a downward departure (such as race, sex, or national origin); (2) discouraged factors; and (3) encouraged factors. *See United States v. Grandmaison*, 77 F.3d 555, 560 (1st Cir. 1996); *see generally Koon v. United States*, 518 U.S. 81, 92-96 (1996).

Section 5K2.13 of the Guidelines encourages downward departures when a defendant committed the offense of conviction while operating under a diminished mental capacity. *See United States v. Mansoori*, 304 F.3d 635 (7th Cir. 2002) (vacating sentence for further consideration of downward departure under § 5K2.13 because sentencing court erred in conclusion that drug distribution was a crime of violence for which downward departures were categorically precluded under § 5K2.13). A review of the attached report of Dr. Spiers reveals substantial grounds for a downward departure in the present matter based on Rodriguez's significantly diminished mental capacity and its substantial contribution to the offense. *See* Exh. A. Underlying the mental defect are extraordinary verbal reasoning deficiencies reflected in objective testing, extremely limited education, the lack of structure in his early development, and the dentrimental effects of gang recruitment on him at the age of 15. *See id., passim.* Such facts provide this Court with broad discretion to depart downward from any applicable guideline range.

### 8. The Court Should Grant Rodriguez A Downward Departure Because of His Extraordinary Efforts to Achieve an Early Disposition of this Matter

Section 5K3.1 of the Guidelines purports to provide for a downward departure of "not more than 4 levels pursuant to an early disposition program authorized by the Attorney General of the United States and the United States Attorney for the district in which the court resides." By so doing, the Guidelines recognize the value of providing defendants with an incentive to plead guilty promptly. Yet, by placing the availability of such a downward departure entirely in the discretion of each United States Attorney for each district, in a manner that defeats the objectives of uniformity and proportionality, § 5K3.1 exceeds the authority of the Sentencing Commission and violates the separation-of-powers doctrine. Unlike cooperation with the government by a defendant under § 5K1.1, courts retain at least as substantial an interest as do prosecutors in encouraging early dispositions. Hence, § 5K3.1 should be treated as an encouraged factor for a downward departure of 4 levels for defendants who plead guilty promptly, regardless of the availability of an early disposition "program" in any particular district.

Here, not only has Rodriguez entered a prompt guilty plea, but he actually made extraordinary efforts to achieve an early disposition of the matter, saving the Court (and the government) significant time and expense. The investigation into Rodriguez's conduct resulted in indictments against 19 individuals. Rodriguez pleaded guilty long before any of the other 18 defendants and did so without even the benefit of a plea agreement. Accordingly, Rodriguez is entitled to a downward departure of up to 4 levels for the extraordinarily early disposition of the prosecution against him.

## Conclusion

Based on the foregoing, before any downward departure, a guideline range should be calculated as no more than 21-27 months. The term of imprisonment in this matter should therefore not exceed 27 months. In addition, the goal of rehabilitation would be best served by recommending that the Bureau of Prisons assign Rodriguez to an intensive confinement program.

Dated: October 6, 2004

Respectfully Submitted,

By: *[signature]*
Barry S. Pollack (BBO # 640625)
DONNELLY, CONROY & GELHAAR, LLC
One Beacon Street 33rd Floor
Boston, MA 02108
(617) 720-2880

Attorneys for Defendant Carmelo Rodriguez

**CERTIFICATE OF SERVICE**
I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail/by hand

Date: 10/6/04   *[signature]*

15