Affidavit of Paul A. Spiers Ph.D.                    1                           June 14, 2004

---

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

Federal District Court: Massachusetts                Docket No. 04-10048

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| v. | ) |
| Carmelo Rodriguez, | ) |
| A.K.A. "King Carmelo". | ) |

Paul A. Spiers, Ph. D., being first on his oath duly sworn, deposes and states:

I received my Doctorate in Clinical Psychology from Clark University in Worcester, Massachusetts. I am an Assistant Professor of Psychiatry at Boston University School of Medicine and currently also hold academic appointments at Clark University and the Massachusetts Institute of Technology. I have previously held appointments at Harvard University Medical School, the University of Paris, France, and at McGill University in Canada.

For thirty years I have conducted and published research in psychology, neuropsychology and neuropsychological assessment. I have taught and lectured concerning my research and experience at various scientific meetings including but not limited to the International Neuropsychological Society, the American Academy of Neurology, the American Neuropsychiatric Association and Society for Behavioral Neurology, as well as at the Harvard Medical School, Massachusetts Institute of Technology and in many guest lectures and workshops. I presently am the principal instructor for a seminar on Forensic Neuropsychology that is given in the Behavioral Neurosciences Program at Boston University School of Medicine. My Curriculum Vitae is attached.

---

Affidavit of Paul A. Spiers Ph.D.                2                        June 14, 2004

---

Regarding assessment in legal matters, I have been retained since 1984 to provide consultation and to evaluate defendants or plaintiffs by a number of attorneys, corporations, and government agencies. These latter have included the Attorney General of California, the Federal Public Defender in Pennsylvania, the District Attorney in Kentucky, the Committee for Public Counsel Services in Massachusetts, and the War Crimes Bureau, Criminal Division, United States Department of Justice.

My opinion has been qualified to be Expert in the Probate, District and Superior Courts of Massachusetts, in the Superior Courts of California and New Hampshire, the Supreme Judicial Court in Massachusetts [Comm. v. Monico, 1986; Comm. v. Roberio, 1996], the Supreme Court in Louisiana, the Federal District Courts in Massachusetts and New Hampshire, and, in a capital punishment appeal, before the Supreme Court of the United States.

In the matter before this Court [U.S. v. C. Rodriguez], I have reviewed the documents listed below, which were provided to me by defense counsel. These records have been used to properly inform my opinion, that is to be provided as an aid in sentencing concerning Mr. Rodriguez (DOB: 05/09/83).

> Federal Grand Jury Minutes, United States District Court of Massachusetts: Testimony of FBI Special Agent M. Karangekis – Indictment of 02/19/04 – Bill of Particulars

> Affidavit of Special Agent M. Karangekis of 02/20/04 including attachments about the Almighty Latin King Nation [ALKN] and transcripts of conversations with informants from 11/08/02 through 02/26/04.

---

Affidavit of Paul A. Spiers Ph.D.            3                       June 14, 2004

---

Government's Submission of Detention Affidavit by M. Sullivan, Esq., United States Attorney dated 02/24/04, prepared by J. Wortman Jr., Esq. and P. Levitt, Esq., Assistant United States Attorneys.

Memorandum concerning the defendant and addressed to the United States Probation Office, dated 04/19/04 from J. Wortman Jr., Esq., Assistant United States Attorney.

> Offense Conduct Appendix: Exhibits 1-12 including indictment, government surveillance, summaries of recorded conversations and interviews with informants.

Presentence Report dated 06/04/04 prepared for the Honorable Nancy Gertner by J. D. Sinclair, Senior U. S. Probation Officer, and reviewed by A. Lorimer, Supervising U. S. Probation Officer.

The only additional information available to me were my conversations with Barry S. Pollack, Esq., defendant's attorney, and a telephone interview that I conducted on 06-08-04 with the defendant's aunt, Ms. Luz Maldonado. Ms. Maldonado had consulted with Mr. Rodriguez' terminally ill mother and confirmed defendant's early developmental history for me. In addition to reviewing these documents and confirming portions of the defendant's history, I interviewed and examined Mr. Rodriguez at the Plymouth County House of Correction on May 12th of this year.

---

Affidavit of Paul A. Spiers Ph.D.            4                    June 14, 2004

---

On 05/12/04, I interviewed and administered the following tests of intellectual and academic functioning to the defendant, as well as screening measures for negative response bias (malingering) and an objective test designed to provide a profile of his personality and psychological functioning.

    Rey Fifteen Item Test

    Pen-Pencil Test

    Wiggins-Brandt Recall-Recognition Test (W-B RRT)

    Wechsler Abbreviated Scale of Intelligence
        Vocabulary
        Similarities
        Matrix Reasoning

    Wechsler Adult Intelligence Scale - Third Edition (WAIS-III)
        Information
        Comprehension

    Minnesota Multiphasic Personality Inventory - Second Revision (MMPI-2)

Based on the documents reviewed, the history obtained, my clinical impression of the defendant and, perhaps most importantly, the results of the testing I administered, I would report the following for the Court's consideration.

1.    Intellectual testing with the WASI revealed that Mr. Rodriguez has an English Vocabulary at the 2nd percentile for his age. While verbal abstraction was a little better, this was still below average and his estimated Verbal Intelligence Quotient was only at the 4th percentile and fell in the range for Borderline Mental Retardation.

---

Affidavit of Paul A. Spiers Ph.D.                5                                    June 14, 2004

2.  I would not make a diagnosis of mental retardation in this case but for an individual of average intelligence, the defendant's verbal intellectual functioning on the WASI was equivalent to what would be expected from a 9 or 10 year-old child.

3.  Consistent with his intellectual abilities, Mr. Rodriguez' academic skills were also tested at this time at only the 3rd percentile and placed him at a 4th grade level, once again equivalent to a 10 year-old child.

4.  All measures of negative response bias were within normal limits but on that task which utilizes a verbal learning paradigm, defendant's ability to encode a word list for effective learning and recall was marked by an absence of primacy and recency effects. Similarly, there was a greater than 15 point discrepancy between his verbal and spatial intellectual abilities, a pattern that is often found in learning disabled adolescents and young adults with developmental, left hemisphere dysfunction.

5.  Mr. Rodriguez described the same childhood background to this examiner as he did to Probation. From an early age, he shuffled back and forth between Florida and Massachusetts with his mother and lived with different family members, though mostly with either his aunt or with his mother. His living situation was clearly unstable, however, and he never had a stable, appropriate male role model. The defendant attended kindergarten and a portion of elementary school in Spanish immersion but repeated the first grade. He believed this was because of absences but it seems equally probable to this examiner that repeating the first grade may have been secondary to a learning disability.

Affidavit of Paul A. Spiers Ph.D.                              6                              June 14, 2004

6. Defendant reported that he did not speak English at all until the third grade and had to be placed in a separate, remedial English as a Second Language class in the 7th grade after transferring out of immersion schooling. Ms. Maldonado described to this examiner that the defendant was moody and often withdrawn as a child, often seeming depressed; an understandable and not unexpected clinical presentation given the lack of support and frequent changes of residence he had experienced.

7. It was in the context of this dysfunctional family, social and developmental trajectory that Mr. Rodriguez was recruited into the Almighty Latin King Nation at the chronological age of 15. However, according to his cognitive testing at this time, six years later, his mental age at that time could not have been any more than that of a pre-adolescent, with verbal intellectual skills equivalent to a nine year old.

8. On the MMPI-2, Mr. Rodriguez answered all of the true-false questions, yielding a valid personality profile consistent with an individual who is admitting to personal difficulties, but is unsure of his capacity and capability to deal with his problems. This was consistent with his clinical presentation, which was not oppositional or characterized by "gang" jargon or values, and which was cooperative and help seeking.

Affidavit of Paul A. Spiers Ph.D.                    7                        June 14, 2004

9. Defendant's clinical profile on the MMPI-2 was significantly elevated on scales reflecting a possible thought disorder that can be exhibited by depression, anxiety and nervousness. Such individuals typically have an inability to relate to others, or a fear of relating, that is handled by suspicion and distrust of others, keeping people at a distance and avoiding close relationships. Such behaviors by the defendant as boasting about himself or exaggerating his accomplishments, even if criminal, would serve to ensure such distance and might be perceived as improving the defendant's stature to help allay his anxiety, poor self-image or distrust.

10. This impression of a troubled young man was further reinforced on the MMPI-2's Supplementary Content Scales, where Mr. Rodriguez had pathologically low scores for ego strength, dominance, and social responsibility. In contrast, he was pathologically high on his potential for alcoholism, being socially maladjusted and for feelings of alienation from self and others. On the Wiener-Harmon scales, Mr. Rodriguez scored in the marginal range for over-reporting psychopathology but, in light of his clinical profile, this is best interpreted as a 'cry for help'.

Based on the findings summarized above, I would report to the Court that, in my professional opinion, Mr. Rodriguez was apparently a troubled, isolated, young man with few family ties or any expectation of stability in his life at the time he was approached and recruited to join the Almighty Latin King Nation [ALKN]. Given the manifesto and doctrines of the ALKN provided by the FBI, it seems apparent that such material and persuasion profoundly influenced the defendant.

Affidavit of Paul A. Spiers Ph.D.                          8                                    June 14, 2004

Recent research has confirmed that the absence of family support increases deviant peer modeling and gang involvement in Hispanic youth; for example, Frauenglass et al. in the *Journal of Clinical Child Psychology* in 1997.

When he was in Massachusetts, as a child, Mr. Rodriguez grew up in the housing projects of Lowell and was often involved in altercations and fights with residents of other projects. In this context, the ALKN could be seen as providing status and security, as well as structure and a sense of belonging, to a troubled, isolated adolescent. In addition, many of his acquaintances as he was growing up in the projects had become "Kings", thereby increasing the sense of belonging he would have derived from joining the ALKN.

Mr. Rodriguez told this examiner that he joined the ALKN after leaving school in the 9th grade, at the age of 15. He was just *"doing my own thing"* in the gang. He had an apartment and a girlfriend, and he had worked briefly at Wendy's and in a furniture store, loading trucks for a few months, coincident with his becoming involved with the ALKN as a means of supporting himself. The defendant denied drug use himself and admitted only that he drank very occasionally.

Mr. Rodriguez does not view himself as having been emotionally committed to the ALKN and did not feel he played a role in it's hierarchy. No matter what title he carried, the defendant stated that *"I was just somebody that everybody knew ... there was a core that knew me but that would be too much responsibility."*

Affidavit of Paul A. Spiers Ph.D.                9                          June 14, 2004

Mr. Rodriguez maintained that he has not been specifically following the ALKN survival code since being in jail and has, by his account, generally avoided contact with other ALKN members. Though there are other "Kings" housed in the Plymouth HOC, where he is incarcerated, Mr. Rodriguez maintained that he has not sought out any close relationships with or support from any other gang members with whom he is in jail.

Mr. Rodriguez also stated that he has no intention of returning to the gang after being released. He hoped that once he has served whatever time he gets, that he can move to Florida to live and work, and to complete his education. He also stated, albeit somewhat immaturely and simplistically, that it is his goal to pursue a job, get married and have kids. He has absolutely no plans to return to Lowell.

Impression

It would be my professional opinion, held to a reasonable degree of scientific certainty, that, given his tested level of academic and verbal reasoning, that the defendant, Carmelo Rodriguez [a.k.a. *King Carmelo*] had to have been suffering from a significantly reduced mental capacity for his chronological age at the time he allegedly committed the subject offenses and that, further, this reduced mental capacity substantially contributed to the alleged commission of these acts. In his current frame of mind, however, I would not consider that Mr. Rodriguez represents a danger to himself, to others or to society.

It is also my professional opinion that defendant would benefit from, and could take advantage of, a sentencing placement that provided him with appropriate structure, proper social modeling, consistent discipline and the opportunity to improve his academic and reasoning skills.

In addition, in order to better understand and maximize his potential for rehabilitation, it would also be my recommendation to this Court that a more comprehensive, diagnostic, neuropsychological evaluation be conducted with this defendant to identify potential treatment and remediation strategies.

*I, the undersigned, Clinical Neuropsychologist, am licensed to practice in the Commonwealth of Massachusetts and this statement is subscribed and sworn to by me, under the pains and penalties of perjury, this 14th day of June, 2004 at Danvers in Essex County of the Commonwealth of Massachusetts.*

Paul A. Spiers, Ph.D.
Assistant Professor of Psychiatry,
Behavioral Neurosciences, Boston University School of Medicine.

Visiting Scientist, General Clinical Research Center,
Massachusetts Institute of Technology - Massachusetts General Hospital.