UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                         )
                         )
          v.             )      CRIMINAL No. 04-10048-NG
                         )
                         )
CARMELO RODRIGUEZ        )

## GOVERNMENT'S SENTENCING MEMORANDUM REGARDING DRUG WEIGHT AND ROLE AND OPPOSITION TO DEFENDANT'S MOTION FOR A DOWNWARD DEPARTURE[1]

In 2002, the Federal Bureau of Investigation ("the FBI") and its North Shore Gang Unit initiated an investigation of drug trafficking and other criminal activity being committed by the Lawrence and Lowell chapters of the Almighty Latin Kings Nation, a national street gang with a substantial presence in Massachusetts (hereinafter referred to as the "Latin Kings"). Over the next eighteen months, cooperating witnesses ("CW's") made nearly 50 controlled purchases of heroin, cocaine, and cocaine base from Latin King members and associates, including

---

[1] The facts set forth in this memorandum are based on the PSR (much of which is undisputed) and the evidence that the government expects to introduce at the Sentencing Hearing in this matter.

The government wishes to make it clear that it is not relying on information provided by CW-1 in this case but rather on the admissions the defendant made at his Rule 11 hearing and the conversations with the defendant and his co-conspirators that were consensually recorded by the FBI. Transcripts of some of these conversations will be available at the sentencing hearing and will fully support the offense conduct on which Probation made its guideline determinations.

many of the gang's local leaders.  All of the buys were made in various locations in and around Lawrence and Lowell, Massachusetts.  All buys were surveilled, recorded, and many-- including cocaine purchases made from this defendant and his compatriots--were also captured on video.

This sentencing arises out of one aspect of the Latin King investigation: the distribution of cocaine by Carmelo Rodriguez, a/k/a "King Carmelo" and three of his Latin King associates. Between October 3, 2003 and February 7, 2004, a CW made 15 recorded purchases of varying amounts of cocaine (generally either a half-ounce or an ounce) from Rodriguez, Ricardo Rosario, a/k/a "King BND," Giecliff Rodriguez, a/k/a "King Bear," and Jonathan Deleon, a/k/a "King Danger."[2]  Additional cocaine and cash were seized from Rodriguez at the time of his arrest.

The investigation in this case also established that these sales (totaling approximately 158 grams from Rodriguez *alone*) were not isolated instances but were rather the tip of Rodriguez' trafficking activity.  Recorded statements made by Rodriguez (who pled guilty to conspiracy and five substantive counts) demonstrate that he was selling as much as 9 grams of cocaine per week.  These statements were corroborated by other recorded statements Rodriguez made (including references to an incident

---

[2]  Carmelo Rodriguez will be referred to as "Rodriguez." Any references to Giecliff Rodriguez will be his full name.

after New Years Eve when he was forced to "flush" $6,000 of cocaine as the police were at his apartment looking to arrest co-defendant Jonathan Deleon and references to additional amounts of cocaine he had at the time deals were made), recorded statements made by his co-defendants (including Ricardo Rosario's acknowledgment that he was selling 5-7 ounces of cocaine per week for Rodriguez, and Deleon's statement that he and Rodriguez sold the "same shit"), and the ease with which Rodriguez sold ounces of cocaine throughout the investigation. Although other evidence confirms that the total amount of cocaine attributable to Rodriguez was much higher, the government is only asking that the Court hold him responsible for 500-2000 grams. This is a figure that the Presentence Report in this matter ("the PSR") describes as "very conservative." PSR Addendum at 4.[3]

The government is also asking this court to impose a role enhancement on Rodriguez based on his position as a supervisor/manger of an organization that involved 5 or more people. See U.S.S.G. §3B1.1(b). The requested role adjustment is also based on recorded statements made by Rodriguez and co-defendants during the investigation. Those statements are corroborated by statements from a cooperating co-defendant and

---

[3] As is indicated below, the 500 gram figure is based solely on sales attributable solely to Rodriguez. In fact, the record shows that he was partners with Deleon during the relevant time period and that Deleon was handling similar amounts of cocaine.

from telephone records and surveillance during the investigation.

The United States Probation Office issued its final PSR in this case on July 14, 2004.  The PSR concluded that Rodriguez is "conservatively" responsible for 500-2000 grams of cocaine and therefore has a Base Offense Level of 26.  PSR at 125.  The PSR also determined that Rodriguez should be assessed a three-level enhancement based on his role as a supervisor/manager in an organization that involved five or more persons.  The government asks that the Court confirm these determinations and sentence Rodriguez within the 92-115 guideline range that is applicable in this case.

The government also objects to the defendant's request for a downward departure.  The request for a diminished mental capacity departure should be rejected both because the perfunctory report submitted on the defendant's behalf is facially inadequate and because of the seriousness of the defendant's crimes and longstanding gang affiliation.  <u>See</u> U.S.S.G. § 5K2.13 (departure is limited to defendants whose "criminal history does not indicate a need for incarceration to protect the public").  The requested 4A1.3 departure fails for the same reasons and because of the defendant's persistent commission of serious crimes while under some form of criminal justice supervision.

**I.  THE GOVERNMENT HAS PROVEN THE TOTAL AMOUNT OF COCAINE ATTRIBUTABLE TO RODRIGUEZ IS BETWEEN 500 AND 2000 GRAMS**

The first issue to be considered in this case is the total

amount of cocaine attributable to Rodriguez.  Probation's
conclusion that 500-2000 grams of cocaine is attributable to
Rodriguez is an exceedingly conservative estimate supported by
his sales and seizures, the statements Rodriguez made in the
course of those sales, and by recorded statements other
defendants made in the course of the underlying conspiracy.  As
set forth above, the government believes that this amount can be
conservatively applied to Rodriguez based on *his* sales and *his*
statements alone without regard to the forseeability principles
set forth in U.S.S.G. §1B1.8.  It is also a figure that can be
applied regardless of the standard that the Court applies to make
the drug weight determination.  See <u>United States v. Mueffleman</u>,
327 F.Supp.2d 79 (D. Mass. 2004).

    **A.** **<u>The applicable legal principles</u>**

    In determining the amount of cocaine attributable to
Rodriguez, this Court's role is to "approximate the quantity of
the controlled substance."  U.S.S.G. §2D1.1, comment n.12.  The
First Circuit has consistently upheld drug-quantity findings
based on an approximation of historical evidence "as long as it
represents a reasoned estimate of quantity."  <u>United States v.
Huddleston</u>, 194 F.3d 214, 224 (1st Cir. 1999)(<u>quoting</u> <u>United
States v. Webster</u>, 54 F.3d at 5 (1st Cir. 1995)); <u>United States
v. Rodriguez</u>, 162 F.3d 135, 149 (1st Cir. 1998); <u>United States v.
Morillo</u>, 8 F.3d 864, 871 (1st Cir. 1993)("When it is impossible

or impractical to obtain an exact drug quantity for sentencing

purposes, a reasoned estimate will suffice"). The "reasoned

estimate" must be supported by a preponderance of the evidence

and is governed by the familiar principle that "when choosing

between a number of plausible estimates of drug quantity, none of

which is more likely than not the correct quantity, a court must

err on the side of caution." United States v. Sepulveda, 102

F.3d 1313, 1318 (1st Cir. 1996)(quoting United States v. Walton,

908 F.2d 1289, 1302 (6th Cir. 1990)).[4]

In making these determinations, this Court has wide

discretion to consider "relevant information without regard to

its admissibility under the rules of evidence applicable at

trial, provided that the information has sufficient indicia of

reliability to support its probable accuracy." U.S.S.G.

§6A1.3(a); Rodriguez, 162 F.3d at 150 (district court properly

considered reliable hearsay evidence and grand jury testimony);

United States v. Valencia-Lucena, 988 F.2d 228, 232 (1st Cir.

1993)("Under this generous formulation, the sentencing court has

broad discretion to determine what data is, or is not,

sufficiently dependable to be used in imposing sentence"). But

---

[4] The government understands that the Court will be
applying the clear and convincing standard pursuant to its
decision in United States v. Mueffleman, 327 F.Supp.2d 79 (D.
Mass. 2004). For the reasons set forth in its Memorandum Re:
Blakely Issues (July 18, 2004), the government objects to the use
of that standard.

see Mueffleman, 327 F. Supp. 2d at 96 (procedural protections
applicable to post-Mueffleman sentencings).  Here, of course, the
government is only asking the Court to calculate the drug weight
applicable to Rodriguez based on the sales to which he pled
guilty and based on statements he and other members of the
conspiracy about *his* activities.  Compare United States V.
Miranda-Sanitago, 96 F.3d 517 (1st Cir. 1996)(drug defendants are
responsible not merely for what they sell or handle, but also for
drug amounts which, from their particular vantage points in the
conspiracy, it was reasonably foreseeable would be involved).

**B.  Cocaine purchases from Rodriguez**

The cocaine purchased from Rodriguez is the first part of
the drug calculus in this case and is an element that, given the
clarity of the videos in this case, Rodriguez had no choice but
to accept.  More than half of the 15 controlled purchases of
cocaine made by the CW in this case (totaling 158.5 grams) were
hand-to-hand sales made by Carmelo Rodriguez (who was not a drug
user and was therefore in the cocaine business purely for
profit).[5]  See PSR, ¶¶182-183 (defendant stated that he tried
marijuana only a few times because "he did not want to waste his
money on it" and has *never used or experimented with any other
controlled substance).*

---

[5]  All of these sales were recorded, most on audio and
video.

These sales are thus a critical starting place for the drug calculations in this case.  They can be summarized as follows:

| COUNT | SELLER | CERTIFIED AMOUNT OF COCAINE |
|-------|--------|------------------------------|
| TWO | ROSARIO | 5.7 grams |
| THREE | **C. RODRIGUEZ**<br>ROSARIO | 13.4 grams |
| FOUR | **C. RODRIGUEZ** | 13.0 grams |
| FIVE | G. RODRIGUEZ | 13 grams |
| SIX | G. RODRIGUEZ | 15.5 grams |
| EIGHT | G. RODRIGUEZ | 11.7 grams |
| NINE | **C. RODRIGUEZ** | 25.7 grams |
| TEN | **C. RODRIGUEZ** | 28.0 grams |
| ELEVEN | **C. RODRIGUEZ**<br>G. RODRIGUEZ | 11.3 grams |
| TWELVE | DELEON | 12.1 grams |
| THIRTEEN | **C. RODRIGUEZ** | 13.6 grams |
| FOURTEEN | ROSARIO | 12.7 grams |
| **F**IFTEEN | G. RODRIGUEZ | 9.9 grams |
| SIXTEEN | **C. RODRIGUEZ** | 26.4 grams |
| 2/7/04<br>(NOT CHARGED) | **C. RODRIGUEZ** | 27.1 grams |
| | **TOTAL** | **234.5 grams** |
| | **TOTAL FOR**<br>**RODRIGUEZ** *ALONE* | **158.5 GRAMS** |

Small amounts of cocaine and marijuana were also seized from Rodriguez at the time of his arrest. <u>See</u> Certification attached

-8-

as Exhibit

**C.    The circumstances of the sales and Rodriguez'
acknowledgment of the extent of his trafficking**

As significant as Rodriguez' hand-to-to-hand sales of
cocaine are in showing that overall amount of cocaine for which
he is responsible, the circumstances surrounding those sales are
even more important.  Those circumstances prove that these sales
were only a small part of Rodriguez' overall trafficking and thus
confirm the conservative nature of the quantity findings in the
PSR.  See United States V. Whiting, 28 F.3d 1296, 1305 (1st Cir.
1994) (affirming drug quantity determination based on general
comments by various defendants estimating average volumes of
business, reports from cooperating co-defendants that particular
quantities of cocaine were handled at particular times,
controlled buys by government  operatives, and evidence
indicating the size and scope of the organization itself).

The simple and undisputed fact in this case is that
Rodriguez was able to make ounce sales of cocaine every time that
the CW asked for them and repeatedly indicated his willingness
and ability to sell the CW more.[6]  During one of the first sales

_____

[6]  The only instances in which Rodriguez did not make an
immediate sale of cocaine to the CW was on October 24, 2003 (when
he told the CW that he had just given his last half-ounce to
Ricardo Rosario) and on December 9, 2003 (when he told the CW he
was in South Carolina on his way to Florida and agreed that she
should call Deleon).  PSR at ¶¶23, 78.  On October 24, Rodriguez
told the CW to call the next day (October 25, 2003) and proceeded
to sell 14 grams of cocaine to the CW.  Id. at 24-27.  On December

Rodriguez made to the CW on October 28, 2003, for example, Rodriguez indicated that he had another ounce in his possession and that he could sell the CW two ounces at a time "without a problem." <u>See</u> PSR at ¶ 34.  Two days later (on October 30, 2003) Rodriguez reiterated that he could sell the CW two ounces of cocaine and quoted the CW a price of $1600.  <u>Id</u>. at 42.  Two weeks after that, on November 14, 2004, Rodriguez told the CW that the Lincoln Towncar he arrived in was his and that "business was good."  <u>See</u> PSR at ¶66.  The PSR reflects that Rodriguez has no verified legitimate employment in his background whatsoever.[7]

Even more significant to the overall drug quantity calculations in this case are the statements that Rodriguez and Rosario made regarding their weekly cocaine sales and the relationship between them (i.e, that Rodriguez supplied Rosario

_____

9, the CW called Deleon and bought cocaine from him.

   The only time that any other member of the conspiracy said that Rodriguez had no cocaine was on October 10 (when Rosario stated that Rodriguez was in New York) and January 2, 2004 (when Rosario reported that Rodriguez had flushed his stash when the police came to his apartment looking for Deleon).  PSR at ¶89.

   [7] In his interview with Probation, Rodriguez admitted he had not worked at any time between August or September 2003 and his arrest on February 23, 2004. PSR at ¶190.  Although Rodriguez claimed to have lived off of money that he had saved from construction work, he was unable to recall the last name of the individual for whom he allegedly worked and who supposedly paid him up to $900 per week over an 18 month period.  Although the defendant also claimed to have worked various other jobs, not one had been verified as of the date on which the PSR was issued. <u>See</u> PSR at ¶¶191-196 (defendant reported six jobs, none of which had been verified).

and is thus responsible for Rosario's sales as well).  E.g.,
United States V. Wacker, 72 F.3d 1453, 1479 (10th Cir.
1995)(statements of a defendant may be used to determine drug
quantity); United States V. Montgomery, 14 F.3d 1189, 1197 (7th
Cir. 1994)(same).  During a controlled purchase on November 8,
2003, Rodriguez told the CW, on tape, that he was selling 7-8
ounces of cocaine per week. PSR at ¶61.   Those numbers were
corroborated in another recorded telephone conversation that the
CW had with Rosario on November 19 in which Rosario stated that
Rodriguez was fronting him ounces of cocaine for $850 and that
he, Rosario, was selling 4-5 ounces per week for Rodriguez.  PSR
at ¶77. In yet another recorded conversation on November 19,
2003, Rodriguez also admitted to the CW that he was Rosario's
source and that he was fronting ounces of cocaine to Rosario.
PSR at ¶66.  This confirmed other statements made by Rosario at
the beginning of the investigation.  See October 10, 2003
conversation with Rosario in which Rosario identifies "Carmelo"
as his source.

      The extent of Rodriguez' cocaine trafficking during the
period of the conspiracy is also demonstrated by other admissions
he made, also captured on tape, regarding "flushing" $6000 worth
of cocaine down the toilet on New Year's Day, 2004.[8]  On that

---

      [8]  All of the conversations on which the government's drug
weight calculations are based come from consensual audio and
video recordings made during the underlying investigation.  The

day, an arrest warrant was outstanding for Jonathan Deleon due to

a shooting at a club on New Year's Eve.  The Lowell Police went

to Rodriguez' apartment looking for Deleon. When the police

arrived, Rodriguez flushed his cocaine inventory down the toilet.

PSR at ¶103.  In relaying this to the CW (on tape), Rodriguez

stated that it was better to be "safe than sorry" and that the

cocaine he flushed was worth $6,000.  Id.  Although the evidence

in this case showed that Rodriguez was selling ounces of cocaine

for between $800 and $850 (and thus that the flushing would have

involved 7 ounces of cocaine or more), the government only asked

to attribute 3 ounces of cocaine to Rodriguez based on this

incident based on statements made by CW-2.

CW-2 is also expected to provide historical information at

the Sentencing Hearing which further corroborates Rodriguez'

trafficking.  CW-2 is expected to testify that Rodriguez and

Deleon sold cocaine together from September, 2003 through

December, 2003 in the Lowell, Massachusetts area.  CW-2 is

---

government's evidence therefore complies with and the basic
principle (recently reflected by this Court in Mueffleman) that
drug quantities are to be determined cautiously and based on
plausible evidence.  See, e.g. United States V. Hernandez, 227
F.3d 686, 689 (6th Cir. 2000)("District Courts may approximate
the quantity of drugs for sentencing purposes based upon
circumstantial evidence as long as they err on the side of
caution");  United States V. Webster, 54 F.3d 1, 6 (1st Cir.
1995) (affirming drug weight calculations based on estimates
provided by lay witness where court adopted the low to middle end
of the offered ranges); United States V. Innamorati, 996 F.2d at
490 (affirming drug weight calculations based on plausible
estimate).

expected to testify that Rodriguez and Deleon were buying nine ounces a week from a source and then reselling it to, among others, members of the Latin Kings.  CW-2 is also expected to testify that, although he made purchases of approximately one ounce per week from Rodriguez, Rodriguez used others including his cousin Victor and King Tanque, to make deliveries for him. The role of these other individuals in Rodriguez' trafficking (and his specific use of others to make deliveries for him) is described below.[9]

## II.  A ROLE ENHANCEMENT IS REQUIRED IN THIS CASE

Apart from drug weight, the only other guideline issue in this case is the defendant's role in the offense.  The PSR properly concluded that Rodriguez should be assessed a three-level enhancement based on his supervision of others in an organization involving at least 5 people.  The government asks that these determinations be affirmed.

### A. The applicable law

The sentencing guidelines provide for enhancements when a defendant has played an aggravating role in the offense of conviction and any relevant conduct.  U.S.S.G. § 3B1.1.  The

_____

[9]The extent of Rodriguez' trafficking is also corroborated by the fact that between September 1, 2003 and December 31, 2003 alone, nearly 2,000 telephone calls were placed from or to his cellular telephone.  Although cellular telephone use has surely become commonplace in recent years, this level of use by someone who was unemployed throughout the relevant time period is plainly corroborative of his ongoing drug trafficking.

extent of the enhancement depends on the nature of the defendant's role and the size of the organization.  Any defendant who acts as an organizer or a leader of an organization that involves five or more persons or is otherwise extensive must receive a role enhancement of four levels.  U.S.S.G. § 3B1.1(a). If (as the government alleges here) the defendant "merely" supervised or managed such an organization, the required enhancement is three levels. Id. at §3B1.1(b).  In all cases involving organizations that are not extensive or involve fewer than five people, the required enhancement is limited to two levels.  Id. at §3B1.1(c). See United States v. Kirkeby, 11 F.3d 777, 778-79 (8th Cir. 1993) (trial court was required to assess three-level enhancement in case involving a criminal activity with five or more participants).

The guidelines do not define "manager" or "supervisor." However, Application note 4 to U.S.S.G. § 3B1.1 does list a series of factors for distinguishing top-echelon participants [i.e., leaders and organizers] from managerial or supervisory roles such as the one sought here.  United States v. Tejada-Beltran, 50 F.3d 105, 110 (1st Cir. 1995); U.S.S.G. §3B1.1, comment (n.4).  These factors include "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of

participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."  Although the list is not exhaustive, it provides guideposts for determining if a defendant is an organizer or leader as opposed to a mere manager.  United States v. Talladino, 38 F.3d 1255, 1260 (1st Cir. 1994).  Compare United States v. Joyce, 70 F.3d 679 (1st Cir. 1995) (A court can find that a defendant is a manager or supervisor where he "exercised some degree of control over others involved in the commission of the crime or he [was] responsible for organizing others for the purpose of carrying out the crime.") with United States v. Fuller, 897 F.2d 1217, 1220 (1st Cir. 1990)(four-level enhancement applies when defendant "exercise[s] some degree of control over others involved in the commission of the offense or [is] responsible for organizing others for the purpose of carrying out the crime").  See also United States v. Cali, 87 F.3d 571 (1st Cir. 1996) (although "immediate or direct control" over subordinates is not a prerequisite to a role enhancement, "[m]anagerial status generally attaches if there is evidence that a defendant, in committing the crime, exercised control over, or was otherwise responsible for overseeing the activities of, at least one other person"); United States v. Veilleux, 949 F.2d 522 (1st Cir. 1990)(role enhancement only requires evidence that defendant supervised the activities of one other person). Compare

-15-

United States v. Fuller, 897 F.2d 1217 (1st Cir. 1990)(reversing role enhancement where defendant did essentially all of the work on private drug distributions himself).

The remaining determination required for a role adjustment involves the scope of the defendants' criminal activity and the breadth of his organization.  Scope determinations under U.S.S.G. § 3B1.1 turn on the number of persons involved in the criminal activity (whether or not they are indicted) or if the activity is "otherwise extensive." See United States v. Dietz, 950 F.2d 50, 53 (1st Cir. 1991).  Thus, a defendant may be subject to a three or four-level role enhancement under section 3B1.1(a) "as long as the record permits the sentencing court to make a specific finding, based on a preponderance of the evidence, which pinpoints [the participants] with enough particularity to give credence to the upward adjustment." Tejada-Beltran, 50 F.3d at 113. Even if the record does not support a finding based on the number of participants, a three or four level adjustment must be imposed if the scope of the activities is extensive.  See United States v. Reid, 911 F.2d 1456, 1466 (10th Cir. 1990)(drug conspiracy that involved four participants and sold 500-2,000 grams of cocaine over a three-week period held to be "otherwise extensive"); United States v. Harry, 960 F.2d 51 (8th Cir. 1992)(drug organization that purchased one pound of cocaine per month for 18 months was "otherwise extensive").

**B. <u>Rodriguez was a supervisor or organizer of a organization involving at least five persons</u>**

Viewed against these principles, the PSR's determination that Rodriguez was a manager or supervisor of an organization involving five or more participants was surely correct. Although Rodriguez activities in supplying cocaine on credit to his co-defendants may not be sufficient by itself to justify the role enhancement, <u>see</u> <u>United States v. Del Toro-Aquilera</u>, 138 F.3d 340 (8th Cir. 1998), the evidence will show that Rodriguez' role also involved others who he supervised. In particular, the evidence will show that Rodriguez used others, including his cousin Victor and Miguel Alvarado, a/k/a "King Tanque" to make deliveries to his various customers for him. This fully supports the PSR's role determination and requires that his offense level be enhanced.

Rodriguez' use of these individuals to assist him in making drug deliveries is fully supported by the record and thus demonstrates either managerial status or, in the alternative, that Rodriguez was an "organizer." <u>See</u> <u>United States v. Tejada-Beltran</u>, 50 F.3d 110, 112-13 (1st Cir. 1995)("One may be classified as an organizer, though perhaps not as a leader, if he coordinates others so as to facilitate the commission of criminal activity... the key to determining whether a defendant qualifies as an organizer is not direct control but relative

responsibility"). As early as October 10, 2003, prior to one of the first drug transactions in this aspect of the Latin Kings investigation, King BND reported that he had tried to call King Carmelo (who was in New York) to see if he (Carmelo) could grab someone to bring me something." Exhibit 1. In the same conversation, Rosario indicated that he was calling Carmelo's "boy, who got his phone." Id. Although Rosario was not able to locate Rodriguez that day, the statements he unknowingly made to an FBI CW on tape regarding Rodriguez' "boy" corroborates Rodriguez' position in the organization and the appropriateness of a role enhancement.

Rodriguez' use of others is also reflected in the buys that did take place in the course of this investigation. For example, on October 24, 2003, Rodriguez was driven to the deal in a Mazda registered to Victor Rivera at 750 Merrimac Street in Lowell, the same address as Rodriguez. Four days later, Rodriguez showed up at another deal in the same car, only this time he was accompanied by Alvarado, a/k/a "King Tanque. Surveillance agents also identified King Tanque as the individual who was with Rodriguez on November 6 and again on February 7, 2004. On yet another deal that took place on November 14, 2004, Rodriguez identified his driver as his cousin, who he stated "is like my brother." When Rodriguez' telephone was seized at the time of his arrest on February 24, 2004, both "Victor" and "Tanque" were

included in the telephone.  Toll records also confirm that scores of telephone calls were placed to them on Rodriguez' telephone during the course of the investigation.

Other evidence supporting the leadership enhancement in this case also comes from still more conversations taped during the investigation.  On December 9, 2003, Deleon told the CW that Geicliff Rodriguez and Rosario worked for "us" (i.e, Deleon and Rodriguez).  PSR at 81.   Rodriguez also stated that he and Deleon "had the same shit" and Rosario acknowledged that Rodriguez was fronting ounces of cocaine to him. Id.  Having made arrangements to consummate deals using couriers, extending credit to co-conspirators and coordinating the activities others throughout the period of the investigation, Rodriguez is subject to a role enhancement. See, e.g., United States v. Martinez-Medina, 279 F.3d 105, 124 (1st Cir. 2002)("a conspiracy may have several individuals deserving a four-level enhancement"); United States v. Berrios, 132 F.3d 834, 839 (1st Cir. 1998)(affirming four-level enhancement for defendant who was contact person for customers, set prices, and used others to distribute drugs); United States v. Howard, 923 F.2d 1500 (11th Cir. 1995)(affirming role adjustment for defendant who fronted drugs and was repaid with proceeds of resales).

There is also substantial evidence that the organization at issue involved at least five people and that the appropriate

-19-

adjustment is at least three levels.  <u>See</u> U.S.S.G. §3B1.1(a)-(b).
As the PSR conclusively shows, the organization that Rodriguez and
Deleon ran also included Rosario and Geicliff Rodriguez.  Because
the record shows it also included Victor and Tanque during the
period at issue, the five person criteria is satisfied and the role
determination in the PSR should be affirmed.

**III. <u>NO BASIS EXISTS TO DEPART ON DIMINISHED CAPACITY GROUNDS</u>**

The next issue raised is the defendant's request for a
downward departure based on his purported diminished capacity.
<u>See</u> U.S.S.G. §5K2.13. Although the defendant told Probation that
"he took honor role and college level classes, had no difficulty
learning, and generally received good grades", <u>see</u> PSR at 184,
the defendant has offered the report of Paul A. Spiers, Ph.D.
that suggests a different story.  Based on a single interview of
the defendant and his administration of a number of standardized
personality and intelligence tests, Dr. Spiers concludes that the
defendant has a "significantly reduced mental capacity" that
"substantially contributed to the alleged commission of these
acts."  Although Dr. Spiers did not so much as mention the
defendant's criminal history, he also offered an opinion that,
"in his current frame of mind," Mr. Rodriguez does not "represent
a danger to himself, to others, or to society."

**A. <u>The applicable legal principles</u>**

To obtain a departure based on diminished capacity, the

defendant bears the burden of showing that he committed the offense while suffering from a "significantly reduced mental capacity." <u>See</u> U.S.S.G. § 5K2.13. This means that the defendant bears the burden of showing that he has a significantly impaired ability to: "(A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." <u>See</u> U.S.S. § 5K2.13 Applic. Note 1. <u>See also</u> <u>United States v. Nunez-Rodriguez</u>, 92 F.3d 14, 24-25 (1st Cir. 1996) (affirming district court's refusal to depart downward based on diminished capacity despite a previous diagnosis of schizophrenia; district court found that, *at the time of the crime*, defendant's behavior demonstrated a cognizance "inconsistent with diminished capacity").

Departure relief under section 5k2.13 is also subject to other significant limitations. They include, among other things, the requirement that a court cannot depart under this section if "the defendant's criminal history indicates a need to incarcerate the defendant to protect the public." A finding under this section precludes a departure under section 5K2.13 as a matter of law. <u>See</u> <u>United States v. Cravens</u>, 275 F.3d 637, 640 (7th Cir.2001).

**B.** **<u>Rodriguez has failed to establish a prima facie case for departure</u>**

The first problem with the requested departure is the

insufficiency of the record to establish even a prima facie case. As set forth above, the fundamental prerequisite under section 5K2.13 is that the defendant either: (i) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (ii) control behavior that the defendant knows is wrongful."

No such showing has been made in this case even if Dr. Spiers' report were given every benefit of the doubt. Dr. Speirs does not diagnose the defendant (who, according to the unobjected to provisions of the PSR, "has never been diagnosed with any mental health condition or taken any psychotropic medication and...does not have any present desire or need for mental health counseling", see PSR at ¶177), with any specific mental disorder. See Spiers Report at 4-10 (no diagnosis of mental retardation, suggesting possibility of other conditions, but ultimately making no such diagnosis). Compare United States v. Barton, 76 F.3d 499, 502 (2d Cir.1996) (vacating § 5H1.3 departure absent evidence defendant suffered from psychosis, where defendant's sense of morality remained intact, and "[h]e appreciate[d] both the societal and moral constraints of his behavior"). Although Dr. Spiers nevertheless concludes that the defendant has a "significantly reduced mental capacity" and concludes that this somehow "contributed" to the commission of these crimes, there is absolutely nothing in his report which suggests that Rodriguez

did not understand the wrongfulness of his behavior or that he lacked the ability to control it. Id.    At most, Dr. Speirs has concluded that the defendant presents borderline intelligence and is the type of person who *could* be easily persuaded by others. Although this conclusion is not supported by the record, what Spiers describes is exactly the type of person that the First Circuit has held cannot be entitled to departure relief under section 5K2.13. See United States v. Lauzon, 938 F.2d 326, 331 (1st Cir. 1991)("We do not think that a person with borderline intelligence or mild retardation who is easily persuaded to follow others presents 'mitigating circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.'").   See also United States v. Withers, 100 f.3d 1142, 1148 (4th Cir. 1996) (section 5K2.13 departure requires demonstrated inability "to reason or process information"; court noted that emotional problems or difficulties are insufficient); United States v. Goosens, 84 F.3d 697, 701 (4th Cir. 1996) (because claimed mental disorders did not interfere with the formation of reasoned judgments or information processing, defendant failed to demonstrate that he suffered a significant impairment).

The information before the Court regarding the manner in which the defendant committed the offenses of conviction also prove that the requested 5K2.13 departure is unavailable as a

matter of law.  The recordings in this case show that Rodriguez
was a careful and successful drug trafficker who knew exactly
what he was doing and carefully cultivated the CW, a potentially
lucrative source of business.  He bragged about the quality of
his cocaine, repeatedly offered to increase the amount of the
sales, and indicated an awareness and understanding of what he
was doing throughout the investigation.  Although Dr. Spiers
suggests that Rodriguez is the type of person who could be easily
led by others, the record before the court also shows that
Rodriguez was in fact the leader of his cocaine trafficking
organization who supplied others with drugs and used them to help
him commit his crimes.  <u>See</u> discussion, above.  The defendant's
acute awareness of what he was doing and his leadership position
in this case thus preclude a diminished capacity departure as a
matter of law.  <u>E.g.</u>, <u>Lauzon</u>, 938 F.2d at 332 (rejecting claim
that diminished capacity contributed to commission of offense
where there: (i) was nothing to indicate that defendant was led
or persuaded by his peers into selling drugs; (ii) sales were
made to DEA agents and confidential informants, who approached
defendant directly; (iii) defendant was not a runner or courier
carrying out the bidding of someone with a stronger intelligence;
and (iv) Probation concluded that "there were no real principals
among the group relating to the sale of illegal drugs"); <u>United
States v. Robles-Torres</u>, 109 F.3d 83, 87n.4 (1st Cir. 1999)

(acknowledging appropriateness of district court's refusal to grant diminished capacity departure where "the tape recordings adequately evinced [defendant's] grasp of ongoing events at the critical times").[10]

### C. **A diminished capacity departure is unavailable due to the seriousness of the defendant's criminal history and the resulting need to protect the public**

Rodriguez's request for a diminished capacity should also be rejected because of the persistence and seriousness of his criminal history. As set forth above, the plain terms of section 5K2.13 preclude diminished capacity departures where there is "a need to incarcerate the defendant to protect the public." That is exactly what the Court is faced with here.

The starting place for this analysis is of course the undisputed portions of the PSR. The PSR assigned Rodriguez a CHC of IV based on four previous convictions. They included convictions for conspiracy to commit burglary, car theft, and the receipt of stolen property as well as a determination of delinquency for breaking and entering in the nighttime. PSR at ¶¶135, 136, 137A, and 139. One of these matters involved a stolen car from which shots had been fired at a police officer and which then led the police on a high-speed chase. Id. at 136;

---

[10]  The defendants ability to make his own decisions and not to be led astray by others is also demonstrated by his acknowledgment that, although he has been associated with the Latin Kings since as early as first grade," that association "never created any legal difficulties for him." PSR at ¶155.

see also discussion below.   Another involved a firearm and
threats to commit murder.  Id. at 137A.   Every one of them (as
well as the offenses of conviction in this case) were also either
committed while the defendant was on some form of release or
involved subsequent violations of probation.[11]   The persistent
nature of the defendant's crimes and the fact that he has
squandered every opportunity the criminal justice system has
given him to reform shows that his departure request must be
rejected. See United States v. Hernandez, 896 F.2d 642, 645 (1st
Cir. 1990)("a defendant undermines the integrity of the criminal
justice system when he commits a crime while ... under its
supervision and control").   See also U.S.S.G. §4A1.3 Background
(recognizing that upward criminal history departures may often be
indicated for younger defendants who have received "repeated
lenient treatment, yet who may actually pose a greater risk of
serious recidivism than older defendants").

     As disturbing as the persistence of the defendant's crimes
has been, it is the circumstances of other offenses that have
either been dismissed or otherwise disposed of without a change
of plea that shows how alarming the defendant's criminal history
truly is.   These cases, which can be considered by this court in
assessing the defendant's departure request, compare United

---

     [11]   See PSR at ¶145 (arrest for knowing receipt of stolen
property on 8/5/02; defendant defaulted on 7/9/03; case continued
to 4/27/04).

States v. Brewster, 127 F.3d 22, 25-28 (1st Cir. 1997) (an upward criminal history departure can be based on prior dissimilar conduct that was neither charged nor subject of a conviction) demonstrate the seriousness of the defendant's prior cases, his disturbing penchant for being around firearms, and that incarceration in this case is necessary to protect the public.

Attached to this Memorandum as exhibits 2-5 are copies of police reports pertaining to these incidents.  Any review of them show the seriousness of Rodriguez' criminal history and that the requested departure is simply unavailable.

**1.  Rodriguez' involvement in a high speed chase and the discovery of firearms on August 13, 2000.**  The first of these matters involved an incident with firearms, shots fired at police, and the discovery of firearms.  At 2:20am on August 13, 2000, the Massachusetts State Police received a report that police in Providence were in pursuit of a white SUV that had been involved in an armed robbery and that had fired shots at pursuing police officers.  The State Police then saw a car matching the description going 110 mph on Route 95.  The SUV struck another car, lost control and went off the road.  The four occupants (the defendant and three other individuals) fled but were captured a short distance from the car, which was found to contain a firearm.  Although the defendant admitted to the officers that he was a member of the Latin Kings, he declined to speak with them

-27-

about the incident.  A copy of the Report is attached as Exhibit
2.

    2.  **The discovery of more firearms on March 31, 2003**.
Another incident demonstrating the seriousness of Rodriguez'
criminal record and his consistent involvement with firearms took
place on March 31, 2003.  On that date, the Massachusetts State
Police received information that a Black Ford Taurus bearing NH
Reg 1198988 was in the city of Lawrence and that it contained
guns.  At approximately 9:30pm that night, officers saw the car
and stopped it.  When they approached the car (which appeared to
only have one occupant) they found two other individuals
crouching down inside the car and found three firearms underneath
the center console.  The driver of the car claimed that she had
borrowed the car from a friend who she could only identify as
"Felix" in order to go shopping and had no idea that there were
guns inside the car.  This report is attached as Exhibit 3.

    3.  **The discovery of more firearms on May 6, 2003**. The
defendant was involved in yet another firearm-related incident on
May 6, 2003, while the firearm-related incident described in the
preceding paragraph remained pending.  See PSR at ¶151. On this
date, the Massachusetts State Police stopped a blue Honda in
Lawrence for traffic violations.  When the police approached the
Honda, which was occupied by Rodriguez (the front seat
passenger), Jonathan Deleon (in the back seat) and Hector Luna

(the driver), they smelled marijuana.  In the course of the stop, the defendant admitted that he had been smoking marijuana. Marijuana and a handgun (that Luna stated was his) were also found.

    **4.  <u>The January 1, 2003 marijuana arrest with Deleon</u>**.

Rodriguez was also involved in another incident on January 1, 2003 with Jonathan Deleon.  In this incident, summarized in the report attached as Exhibit 5, Deleon and Rodriguez were arrested after Lowell Police Officers saw what they believed to be drug transactions.  Cash and marijuana were seized.[12]

<u>CONCLUSION</u>

    Probation's assessment of Carmelo Rodriguez is exactly correct.  Rodriguez is a dedicated cocaine trafficker who used the sale of drugs, not to feed any drug habit, but to make money from others.  Although Rodriguez undoubtedly sold far more than the 500 grams of cocaine for which the PSR seeks to hold him responsible, that conclusion is a sensible and conservative figure that should be affirmed.  Because the record shows that Rodriguez also supervised others as part of a distribution

---

    [12]  The defendant has also filed a perfunctory motion for a downward departure under section 4A1.3.  Given the persistent nature of the defendant's criminal behavior, his repeated violation of probation or commission of crimes while on pretrial release, the substantial evidence of other serious criminal activity, and the fact that the defendant had yet another pending case at the time of his arrest here, <u>see</u> PSR at ¶145, this request is also baseless and should be denied.

organization that involved at least 5 people, a role enhancement is also appropriate in this case.

The defendant's requests for departure fail as a matter of law. The defendant is a person with a serious criminal history and who is therefore categorically ineligible for departure relief under U.S.S.G. §5K2.13. His repeated commission of crimes, often while under some form of judicial supervision also make a departure under section $A1.3 inappropriate. In short, there is nothing extraordinary about this case for purposes of the Sentencing Guidelines and a sentence within the applicable guideline range should be imposed without regard to this court's decision that the sentencing guidelines are no longer binding authority. See Mueffleman, 325 F.Supp. 2d at 95 (recognizing that the sentencing guidelines will continue to shape the outcome of sentencing).

                    Respectfully submitted,

                    MICHAEL J. SULLIVAN
                    United States Attorney

                    By: /S John A. Wortmann, Jr.
                    JOHN A. WORTMANN, JR.
                    Assistant U.S. Attorney
                    One Courthouse Way
                    Boston. MA 02210
                    (617) 748-3207

_____